### HENTSCHEL v. CARTHAGE SULPHITE PULP CO. et al.

(Circuit Court, N. D. New York. March 29, 1909.)

#### No. 7,152.

1. PATENTS (§ 51*)—PATENTABILITY—PRIOR PUBLIC USE.

   The use of a composition for lining pulp digesters in the practical lining of digesters for use in a number of different plants by persons to whom it had been disclosed without secrecy was a public use, which, if continued for more than two years, would bar a patent whether such use was known to the inventor or not, unless the delay was for the purpose of perfecting the invention.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 66, 72; Dec. Dig. § 51.*

   Priority and continuance of public use of invention as affecting patentability, see note to Eastman v. Mayor, etc., of City of New York, 69 C. C. A. 646.]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—COMPOSITION FOR LINING PULP DIGESTERS.

   The Hentschel patent No. 719,216, for a composition for digester linings, is void for anticipation, and also because of prior public use of the composition by others than the patentee for more than two years before application for the patent. Also held, that infringement was not proved, conceding the patent validity.

   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit to restrain alleged infringement of United States letters patent No. 719,216, dated January 27, 1903, on application filed September 16, 1902, and issued to Ernst Hentschel, for composition for digester linings and for an accounting.

Albert F. Forthmiller (Walter E. Ward, of counsel), for complainant. W. B. Van Allen (Henry Schreiter, of counsel), for defendants.

RAY, District Judge. The patent in suit is for a composition used to line digesters, usually, if not always, used in the manufacture of

---

pulp for the manufacture of paper. The patent has two claims, reading as follows:

"(1) The herein-described composition as a lining for digesters, consisting of litharge, Portland cement, quartz or crushed fire-brick, glycerin and silicate of soda.

"(2) The herein-described composition as a lining for digesters, consisting of litharge, Portland cement, quartz or crushed fire-brick, and glycerin and silicate of soda, in about the proportions of two hundred pounds of litharge, one hundred pounds of Portland cement and one hundred pounds of quartz or crushed fire-brick, and a mixture of about twenty gallons of glycerin and about four and one-half gallons of silicate of soda added to said quantity of the aforesaid materials in a dry state."

The two claims differ only in the fact that claim 2 gives the proportions of the ingredients used to form the composition. As this claim follows the specifications which must be read with claim 1, I fail to see any difference in the claims. The composition is claimed as "a lining for digesters" only. The ingredients named, except the glycerin and silicate of soda, are thoroughly mixed dry; the fluid, glycerin, and the silicate of soda are thoroughly mixed by themselves, and then added to the said dry mixture so as to thoroughly moisten and reduce the said dry materials to a thin pasty consistency. A digester before being lined consists of a metal shell. In the complainant's described process of lining and using his composition he proceeds as follows: First, there is a lining of brick next the shell; second, there is a second lining of brick at a little distance from the first, thus leaving a space between the two linings; third, this last-mentioned space is filled with this composition in a liquid state and is allowed to harden. It is claimed that this hardened mixture formed of the ingredients named in about the proportions named is inpenetrable by the acids employed in treating the paper stock, and acid-proof, so that whatever of the acid percolates through the inner brick lining is prevented from reaching the second and outer brick lining and the shell itself. The object of the invention and composition is to prevent the acid reaching the shell. Other compositions have been used in substantially the same way for the same purpose. The invention resides in the selection and mixing of these particular ingredients in the manner mentioned and in about the proportions mentioned.

The defenses urged are noninfringement and anticipation, and public prior use and description thereof in printed publications more than two years prior to complainant's invention. Utility and efficiency is not denied.

I do not think the patentee has limited himself to the described mode of using the composition. The claims are for the composition and its use in a lining for digesters. Any one can use it elsewhere. The claims are limited in that respect. They may be so limited by the prior art as to be void for want of patentable invention, and they may be limited by that art to substantially the same proportions of the ingredients mentioned. The function of the composition made from these ingredients is to prevent the acid used in the treatment given the paper stock or paper pulp in the digester from percolating through the brick lining and reaching the metal.

## Prior Art.

The German patent to Guido Baerwaldt, No. 70,477, dated January 31, 1893, after pointing out the effect of the acid on the brick lining and on the metal shell of the digester, says:

"To obviate this defect, is the object of this invention. To this end various substances are used for the lining of the digester shell, which are either combined together and applied on the shell, or applied singly one after the other, to produce a fully acid-proof and heat-resisting lining on the shell of the digester, and there are used, for this lining, cement, either alone, or mixed with crushed quartz, glass, chamotte, or the like, and litharge with glycerin."

We have in the patent in suit: (1) Litharge; (2) Portland cement; (3) quartz or crushed fire brick; (4) glycerin; (5)silicate of soda.

In the German patent: (1) Litharge; (2) cement; (3) crushed quartz, or glass or chamotte (crushed fire brick); (4) glycerin; (5) silicate of soda (water glass).

The German patent also says:

"In constructing this lining it is proceeded as follows: [after cleaning the metal] And then a layer of cement, mixed with water, alkali, or caustic potash, water glass, milk lime, or the like is applied some centimeters in thickness, wherefor either wholly pure cement may be used, or a mixture of cement and quartz sand, or powdered glass or chamotte or the like. Before this foundation layer of cement has set a grout of litharge and glycerin is rubbed hard into it (or onto it) and a layer of this litharge and glycerin composition is made to cover the cement layer to a certain thickness."

'All the ingredients of the complainant's patented composition are found in the composition of this German patent. Complainant says "Portland cement," and the German patent says "cement." The combination of these ingredients in lining a digester is different. In the Hentschel patent they are all made into a grout, all mixed together and made into a plastic compound and then, in effect, applied to a brick lining which is next the metal; while in the Baerwaldt (German) patent all the materials except the litharge and glycerin are made into a plaster and plastered on the thoroughly cleaned metal, and then the litharge and glycerin are made into a grout and applied to the said plaster coat, either by rubbing it hard "onto" or hard "into" the same. If by rubbing the litharge and glycerin mixture into the plaster, before it sets, they are made to commingle, the one absorbing the other, there is little difference in the two compositions. If the litharge and glycerin mixture is simply rubbed hard onto the plaster so as to form an outer coating thereto, we do not have a mixture of all the ingredients such as is described in the complainant's patent. Another difference is noted: Complainant mixes all the ingredients, except the glycerin and silicate of soda dry, and then mixes the two latter ingredients, and then adds this mixture to the first, while Baerwaldt mixes his cement and quartz with the silicate of soda—and this is not a dry mixture—and then mixes and adds the litharge and glycerin. The German patent says nothing as to the proportions of these ingredients. "Chamotte" is the same as crushed fire brick, and "water glass is silicate of soda dissolved in water." Soluble glass is a simple silicate of potash or soda, or of both these alkalis. (Ure's Dictionary.)

Hentschel confines himself to Portland cement, while Baerwaldt uses,

so far as appears, any kind of hydraulic cement; that is, any that will set or harden under or when mixed with water. This would include Portland cement, one of the two kinds well known in Europe. It must be kept in mind, however, that this is not a patent for a process, but for a composition.

It is self-evident that in view of the prior art there was no invention in the mere selection of these various ingredients to form a mixture or composition for the purpose mentioned. Every one had the right to use them in combination for the purpose mentioned. It may have required some judgment and experience, and undoubtedly did, to combine them in proper or suitable proportions so as to have the composition resist the acid. And whether to use the one hydraulic cement or another is not taught by the Baerwaldt patent. For some purposes and in some combinations one hydraulic cement may be and often is the full equivalent of another, but this is not universally true However, the prior art gave Portland cement as the preferred and best and most efficient for making digester linings. Patent to Stebbins, No. 528,400, dated October 30, 1894, "Digester," calls for a lining of lead next the metal shell and "a heat-absorbing and acid-resisting lining composed of Portland cement, asbestos, lampblack, sulphate of barium, litharge, and silicate of soda in suitable proportions." This patent also shows and describes the following construction: (1) Metal shell; (2) lead lining; (3) a mixture lining composed of Portland cement, asbestos, and broken, burned brick clay made acid-resisting by the addition of noncorrosive substances, such as lampblack, sulphate of barium, litharge, and silicate of soda; (4) a lining of blocks made from brick clay free from magnesia, lime, or other ingredients that would be affected by the acids, hydraulic pressed, hard burned, and porous and set in cement; (5) a further composition filling, composed preferably of a mixture of Portland cement and crushed stone or sand with a large portion of silica, to which for imparting the acid-resisting quality is added noncorrosive substance, such as lampblack, sulphate of barium, and litharge; (6) a lining of blocks, brick, or tile made from fire clay or other suitable material and combined with the filling. These linings counteract the variations in temperature. In patent to Norton, No. 480,934, dated August 16, 1892, in a digester, we have a lining composed of pulverized fire brick, seggar, stoneware, glass or glass sand, asbestos fiber, sulphate of baryta, Portland cement, and an aqueous solution of about $36°$ Baume of silicate of soda, all thoroughly mixed. The Curtis patent, No. 485,810, of November 8, 1892, for paper-pulp digester, shows an intermediate lining next the metal shell composed of asbestos and cement made plastic and applied to the shell, and then the cement lining composed of Portland cement and ground glass or quartz, with or without a percentage of soluble glass, the cement being carbonized by the absorption of carbonic acid gas, whereby it is converted into an artificial stone. For the same purpose in digesters, and to resist the acid, we have Portland cement, silicate of alumina, ground blue slate, silicate of soda or water glass, in Austrian patent to Kellner, dated February 5, 1891; and ground slate, ground glass, Portland cement,

and silicate of soda, or water glass, in patent to Kellner, dated July 7, 1891. He says the addition of the ground glass and the use of the weak solution of water glass (or silicate of soda), instead of the plain water, to form the cement, will be found greatly to increase the insolubility of the lining and to improve its acid-resisting qualities.

The application for this Hentschel patent was rejected October 28, 1902, on Stebbins, No. 528,400, and Mixer, No. 326,317, of September 15, 1885, "Manufacture of Artificial Stone or Marble," which shows a composition of soda alum or potash alum, 4 pounds; salt of sodium, preferably bicarbonate of sodium, 4 pounds; soluble glass, 3½ pounds; bichromate of potash, 2 pounds; ferrous sulphate, 2 pounds. The above solution to be mixed with a mixture of about four pounds each of glycerin and litharge. In his specifications Mixer said:

"The peculiar properties of the glycerin and litharge in connection with the foregoing solution"—the entire composition—"cause the stone to become extremely hard."

The examiner said:

"It is thought that the glycerin added in applicant's composition is merely for the purpose of further hardening the composition [that of Stebbins, which is the same as complainant's, except it contains no glycerin], but its use involves no invention, in view of Mixer, 326,317, September 15, 1885 (106–30–Soluble Silicates). It is held, therefore, that the addition of glycerin to Stebbins' composition would involve no invention."

There was no reference to Baerwaldt, heretofore described, who did have glycerin—that is, all of complainant's ingredients—used for the same purpose. The applicant, Hentschel, under date of December 8, 1902, called the attention of the Patent Office to some minor differences, to the fact that the Mixer patent was in a different art, and that Stebbins' did not contain any glycerin, and then said:

"In the composition employed by applicant as a digester lining, the glycerin appears to insure the expansion and contraction of the material of the composition with the material of the digester lining so as thereby to maintain an acid-tight joint."

The claims were thereupon allowed and the patent issued. I think it was allowed upon the statement as to the action of the glycerin in the composition. I do not see that the art of making artificial stone to put under a building or other structure, or in a cellar, or inside buildings, is not analogous to the art of making artificial stone with which to construct the lining of a digester. It is artificial stone whether used in one place or another.

If the attention of the Patent Office had been directed to the Baerwaldt patent, I do not think the Hentschel patent would have been granted. Lead in such linings, next the metal shell, had been in use a long time on account of its acid-resisting qualities. Lead is found in glass, and by mixing and heating finely ground litharge and olive oil, adding water to make up for evaporation, in a short time we get a plaster of lead. The American Cyclopedia (Ed. 1881) says that glycerin is largely used in the preparation of cements. (See "Glycerin.")

The evidence in this case shows that several persons in the United States, prior to the application for the patent in suit, had been using these various ingredients as a mixture or composition for lining digesters. There was a written or printed formula for their mixing, giving proportions.

The Baerwaldt patent, granted in 1893, was about nine years old when Hentschel applied for his in the United States. He is conclusively presumed to have been acquainted with the prior art, but he, as well as Gast, claims to have discovered the utility of these elements in digester linings by experiments about 1900–02. Arthur Grunwald, a witness for the complainant, says that he came to this country in 1893, about two years after John J. Gast, his uncle, another witness for complainant, came here; that he met Hentschel, the complainant, at Palmer Falls, in August, 1893, at the residence of his said uncle, John J. Gast, and that Hentschel was living with Gast. In 1900 Hentschel was running a hotel at Palmer Falls. He now lives at Muskegon, Mich., where he owns a hotel and acts as agent of the Muskegon Brewing Company. At one time he worked for the Non-Antem Company, who put in digester linings. Before coming to the United States, and about 1889—that is, when he was about 10 years of age—Grunwald visited his uncle Gast, at Rietschen, Germany, who was then foreman over the sulphite mill at that place, and there met Hentschel. Hart, himself, says that from 1890 to about 1903 he was in the employ of the Hudson River Pulp & Paper Company, and before that in the sulphite pulp and paper making business at Ritchen, O. L., Germany. Hentschel was a lead burner by trade, and for some years after coming to the United States was in the employ of the Non-Antem Digester Company and engaged more or less in repairing digester linings. It is somewhat significant that we find these Germans who had been in this business in Germany using the materials described in the Baergaldt German patent of 1893 for lining digesters and repairing the linings of digesters in the United States. I do not think either of these men, not shown to have any chemical knowledge, adopted these materials by chance, or because of any knowledge they had of their properties gained otherwise than by a practical knowledge of the art gained by working in it and what was told them by others. I am not favorably impressed with Gast as a witness. He was called as a witness by both parties to this litigation. His evidence shows a prior public use of this composition, substantially as set forth in the patent, more than two years prior to the application filed by Hentschel, unless such use can be found to have been merely experimental, and experiments of Hentschel and those working with him and under his directions. The defendant claims that instead of this having been an experimental use by Hentschel, who concededly was working for and under others, it was the use of the mixture or composition by him, Gast, and others, pursuant to the suggestions and directions of his employers and superiors, who had a printed or written formula which guided the workmen. Prior public use must be shown, not by a mere preponderance of evidence, but by clear and satisfactory evidence and beyond a reasonable doubt. If, however, the complainant would show

that this invention antedated his application for a patent, he must show that fact by a preponderance of evidence. Webster Loom Co. v. Higgins, Fed. Cas. No. 17,342, 4 Ban. & A. 88, 15 Blatch. 446, 16 Off. Gaz. 675.

There is no doubt here that this combination of these elements, and of all of them, in substantially the same proportions—that is, this composition—was made and in public use where the public could see it, and see how the various substances composing it were combined and in what proportions, long before the complainant applied for his patent. There was a mill known as the J. & J. Rogers Mill, at Ausable Forks, N. Y., where one Geo. E. Hall was superintendent. Geo. H. Chobbott was foreman of the work, James Rogers was manager, James M. Sheffield was secretary and treasurer, and Charles H. Bruce a mason who worked on the digester lining. Hall says that in 1896 or 1897 at this Rogers Mill it became necessary to enlarge it, and that a digester was put in and lined with Non-Antem lining; that he watched carefully and noticed that after it had been in use some 30 to 60 days the workmen went into the digester and pointed all joints between the bricks "with a mixture composed of litharge, quartz, or sand made into a stiff paste with glycerin"; that the old digesters lined with the Curtis and Jones lining began to show great wear, and he saw that it was necessary to reline some or all of them; that he called in Chabbott, who was in full charge of the digesters and acid plant, and they came to the conclusion that the backing of the Curtis and Jones lining was practical and would resist the acid, but that the tiling in front of it was not suitable for the intended purpose; that they concluded to put in a facing of digester brick, such as were used in the Non-Antem lining, but that in the course of investigations and experiments which they made they concluded that:

"Brick, instead of being laid in the ordinary cement mortar, laid in a mixture of litharge and sand made into a stiff paste with the glycerin would be made more serviceable than if the brick were laid in cement mortar and the joints covered with the litharge mixture. This digester was lined with the brick facing, and, instead of using a cement mortar, the litharge, sand, and glycerin were used."

He also says they lined or partially relined more than one. He also says that he left the Rogers Company and went with the International Company; that the good reports as to the results of the use of the above materials, not only in those digesters but others, led him to believe this was one of the best linings that could be made to resist the action of the acid in cooking wood in the sulphite process. Also:

"Litharge being somewhat expensive, more so than cement or sand, it struck me that some money could be saved in lining a digester if something could be substituted for a part of the litharge, and for this reason cement was suggested and instructions given to this effect, and Mr. Connors was told to try the proportion of one-third each, sand, litharge, and cement, and mix same to a stiff paste with glycerin, and if he thought necessary to add silicate of soda, but this would be left to his judgment, as I did not know what action or what effect the addition of cement to the litharge might have. To answer the question it was the experience that I had at the Rogers Mill which proved so satisfactory that led me to give instructions to line the digester at Palmer Falls as I did."

He also says in substance that silicate of soda was also used there in one of the digesters.  Also:

"Q. 32. Are you able to state in what other mills of the International Paper Company digesters were lined or relined, using such compositions as you directed to be used in the Palmer Falls mill?  A. Ft. Edward Mill, Piercefield Mill, Watertown Mill, Niagara Falls Mill, South Gardiner, Maine, Rumford Falls Mill, Berlin, N. H., and Bellows Falls, Vt.  Q. 33. Please state what, if anything, you know about a certain letter or circular referred to in the testimony of some other witnesses herein as 'Hall's Letter of Instruction for Lining of Digesters'?  A. I cannot give the date; can only say that a letter of general instructions as to the care, repairing, examination of fittings, and general instructions as to the operation of such digesters was sent out by me to the different mill superintendents; such instructions was supposed to be given to the different foremen or managers of sulphite mills by the manager or superintendent.  Q. 34. Was this Hall's letter of instruction composed by you or under your direction?  A. Yes."

He says he left Rogers in December, 1897.  I find nothing improbable or questionable in this; on the other hand, it is probable and thoroughly corroborated.  He also says the glycerin makes a bond between the litharge and cement, and combines with litharge and cement to make a paste; also that the use of silicate of soda in the combination hastens the work—makes it set or harden more quickly.

Hugh Connors, superintendent of construction of the International Paper Company, says, in substance, that he was at Palmer Falls in 1899, 1900, and 1901, in the employ of said company, which then owned the mill formerly owned by the Hudson River Pulp & Paper Company, and knew Hall, who was superintendent; that at Palmer Falls, about 1899, they cut out a Non-Antem lining and put in a cement lining—hydraulic Portland cement—

"composed of three inches of cement plastered on the shell, one course of brick laid in a composition of litharge, sand, cement, glycerin, and silicate of soda, with one inch of grout between the brick and the cement plastering."

He says he acted as foreman of the construction of this relining, and that it was done under the instructions of Hall, as he understood it; that he received the instructions from Hall or Curtis; that more than one was relined in this manner and with this composition.  He says Gast gave no orders.  Gast was foreman of the sulphite mills, but this work was done under authority of the construction and maintenance department.  I find no ground or reason for doubting the truthfulness or accuracy of this testimony.

Connors also testified to the letter of instructions from Hall for relining, amongst other things, and says it called for one part cement, one part litharge, one part of sand or quartz, and enough glycerin to make a stiff mortar, and silicate of soda if needed.  It was in the files of the office at Palmer Falls, and its existence is corroborated.  The same composition was used for pointing.  The same composition was used at Rumford Falls, Me., about 1900.  Between the fall of 1899 and April, 1900, the witness lined a digester at Ft. Edward; between February 1, and March 1, 1902, one was lined at Niagara Falls; and after March 1st, and right along, digesters were lined at Watertown, N. Y., at Bellows Falls, Vt., South Gardiner, Me., and Austin, Pa., or pointed, all with this same mixture.  There is corroboration of all this,

and in 1896 and 1897 J. J. Rogers, & Co. purchased acid-proof brick, glycerin, litharge, and silicate of soda, and produced the invoices. Portland cement, sand, and crushed fire brick can be obtained almost anywhere at almost any time. Hentschel himself gives no testimony in the case, and did not verify the bill. Gast seems to act as an agent, although Grunwald, who gave testimony for the complainant verified the bill as agent of Hentschel. Gast says that Hentschel first disclosed or told him the composition named in the patent in suit in the year 1900, although he cannot tell the exact date.

The application for the Hentschel patent was filed September 16, 1902. Going back two years takes us to September 16, 1900. This mixture of litharge, Portland cement, quartz or sand, glycerin, and silicate of soda had been used in 1896, 1897, 1899, and early in 1900, quite generally in the digesters of the International Company, and in at least two of those of J. J. Rogers & Co., and this use was not under the direction of or the result of any experimentation of Hentschel or Gast. I find nothing contradictory, or suspicious, or improbable in the testimony of Hall and Connors, but I cannot say the same of Gast and Grunwald. Both show interest and a willingness to vary in order to meet the exigencies of the case. Gast was asked this very plain question by counsel for the complainant:

"Q. 6. C. R. 72. Was it possible to determine if such composition [referring to that described in the patent] would be successful in lining a digester until it was actually tested in lining a full-sized digester? A. It certainly was."

Here was a plain, distinct answer to a plain, distinct question, one free from all ambiguity, one not at all complicated. This answer was not satisfactory. The exigencies of the case demanded evidence that a long time should be required for experimental work. This question immediately followed:

"Q. 7. C. R. 72. Is there any other answer that you want to make to that question? A. Yes, but I had to wait till the chance had come, and it did come."

I fail to see why he had to wait for a chance for some other answer. I do not think the witness meant that, but in that answer gave his full explanation, which was that, while he could tell whether the mixture was a success or not before lining a full-sized digester, he had to wait in order to make a test with a full-sized digester until the opportunity came to line a full-sized digester, and that such opportunity did actually come later. But then followed a question and the answer thereto, which shows clearly how ready Gast was to adopt any self-serving suggestion and make his testimony conform thereto:

"Q. 8. C. R. 72. Do you mean to be understood that it was necessary to test it in lining a full-sized digester before you could pronounce it a success? A. Yes."

It seems to me the witness should have been left to give his own meaning and explanation and qualify his prior answers if he desired so to do. This question put the desired answer in the mouth of this willing and interested witness. Courts would be unjust to litigants and bring the administration of justice into deserved contempt should they

place reliance on such answers to such questions, and without close scrutiny allow them to determine litigations where the facts, as here, are sharply in controversy. This manner of drawing out evidence was condemned by the Supreme Court of the United States. Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 265, 8 Sup. Ct. 122, 31 L. Ed. 141, where the question was the same as here. However, it is self-evident that such linings in such digesters, like any lining therein, could not be pronounced a definite success as to durability until one had been put in complete and tried or tested by time and use. The question and answer shows how ready the witness was to adopt suggestions and comply with their demands. Gast says (C. R. p. 75, answer to Q. 21) that after two years' experiment Hentschel told him, Gast, to apply for a patent. He also says that this composition was disclosed to Geo. E. Hall and Hugh Connors at the time it was put on.

"Q. 22. Was this composition disclosed to George E. Hall and Hugh Connors at the time it was put on; that is, did they know about what the composition was composed of and how it was used when it was put on? A. Yes."

As their experiments, if they were experiments, of Gast and Hentschel, ran back into 1896 and 1897, some five years, and during that time Hall and Connors were publicly using the composition in all parts of New York where digesters were used, and in Maine, Vermont, and Pennsylvania, it seems to me that the uses of it by them were not experimental, but quite public and general. There was no injunction of secrecy. The composition, so far as there is any proof of infringement by this defendant, was as complete in 1897 as in 1902. Its utility and durability may not have been as completely demonstrated. But all the ingredients were used in composition in substantially the same proportions for the purpose of lining digesters in the same way the defendant lined and lines its digesters in many places and in four different states by Hall and Connors in the digesters of the International Company, independent of Hentschel and Gast. And there is no proof that Hentschel or Gast was experimenting or changing ingredients or the proportions of those first used. At best they were waiting to see if the composition was durable. "By the provisions of the statutes, if the invention was in public use or on sale in this country with or without the consent of the inventor more than two years before his application was filed, the grant of a patent is barred. * * * The bar of public use arises from use by the inventor himself or by others, but in either case it must be such as makes the invention accessible by some members of the public. Public use, however, does not mean a general adoption or use by the public as distinguished from a secret use. Exhibition of a design is a public use. A single instance of public use by a single individual will operate as a bar. General and continuous use is unnecessary. The bar arises whether or not the inventor knows of or consents to the public use. To constitute public use the invention must have been complete. This does not mean, however, that the machine embodying it must have been perfect, but merely that it shall have been sufficiently perfect to be practically applied to its intended purpose. * * * Use of the invention in secret, either by the inventor or his agents under an injunction of secrecy, is not a public use. But

permitting another to use the invention without any injunction of secrecy is public use, although the use may have been concealed .from others. Use of an invention in public, however, in its natural and intended way, is a public use, although from its nature it is concealed from the general view of the public." 30 Cyc. 865–867, and numerous cases there cited; Andrews v. Hovey, 123 U. S. 267, 8 Sup. Ct. 101, 31 L. Ed. 160; Same v. Same, 124 U. S. 694, 701, 708, 709, 719, 8 Sup. Ct. 676, 31 L. Ed. 557; Shaw v. Cooper, 7 Pet. 292, 320, 323, 8 L. Ed. 689; Pennock v. Dialogue, 2 Pet. 1, 7, 16, 7 L. Ed. 327; Grant v. Raymond, 6 Pet. 218, 244, 248, 8 L. Ed. 376; Gill v. U. S., 160 U. S. 426, 430, 16 Sup. Ct. 322, 40 L. Ed. 480; Manning v. Cape Ann Isinglass, etc., 108 U. S. 462, 2 Sup. Ct. 860, 27 L. Ed. 793; Elizabeth v. American N. P. Co., 97 U. S. 126, 24 L. Ed. 1000; .Brush v. Condit, 132 U. S. 39, 10 Sup. Ct. 1, 33 L. Ed. 251.

There was nothing fraudulent, piratical, or surreptitious in this use of this composition by Connors, Hall, and others on complainant's own theory and testimony. There was, according to Gast, an open disclosure; nothing said to the effect that a patentable discovery had been made or that experiments were being made to test the efficiency of the composition. Hentschel does not speak on the subject or explain why he did not apply for a patent sooner, or how he came to disclose his invention, or claim that he delayed for the purpose of making experiments. There is no evidence of any changes in the composition or in the proportions to bring it to a higher state of perfection. Nothing was said indicating that it was to be used by Hall or Connors in perfecting the composition or by way of experiment. In Andrews v. Hovey, 123 U. S. 267, 8 Sup. Ct. 101, 31 L. Ed. 160, reconsidered and rehearing denied, 124 U. S. 694, 8 Sup. Ct. 676, 31 L. Ed. 557, the case turned on the question whether a limited public use by a person other than the patentee, more than two years prior to the application for the patent— driven well—to whom the inventor and subsequent patentee disclosed his invention or discovery, invalidated the patent. In Andrews v. Hovey, 124 U. S. 694, 708, 709, 8 Sup. Ct. 676, 31 L. Ed. 557, on application for rehearing, it appears that the patentee, Green, more than two years before he applied for his patent, gave Mudge and Saggett information of his invention. Saggett put down four wells, and Mudge put down five. They were not experimental wells. The court, Mr. Justice Blatchford giving the opinion, said, referring to the decision of the case in 123 U. S. 267, 8 Sup. Ct. 101, 31 L. Ed. 160:

"Our decision was that the patent was invalid, because the invention covered by it had been in public use more than two years before Green applied for the patent, without reference to the question whether he consented to such use or not."

The court quoted the section of Act March 3, 1839, c. 88, 5 Stat. 353, in question, viz., section 7 of that act, and said:

"The question involved arises upon the second clause of section 7 of the act of 1839," etc.

The second clause reads as follows:

"And no patent shall be held to be invalid by reason of such purchase, sale, or use prior to the application for a patent as aforesaid, except on proof of

abandonment of such invention to the public; or that such purchase. sale. or prior use has been for more than two years prior to such application for a patent."

The court said that the first clause of the section relates in no manner to the validity of the patent, and that "the second clause relates wholly to the validity of the patent." The court then reviewed all the cases bearing on the construction and meaning of the section, especially the second clause, stated the facts as to the use of the invention by Mudge and Saggett as above referred to, and said:

"But there is nothing that indicates in regard to these wells fraud, or piracy, or surreptitiousness in the sense of the decision in Kendall v. Winsor," 21 How. 322, 16 L. Ed. 165.

The court then said:

"Of course, Green, from the moment of the invention, had an inchoate property therein, which he could complete by taking a patent. The first clause of the seventh section of the act of 1839 gave to the persons for whom those wells were constructed a right to use them without the consent of Green, and the second clause of that section had the effect to make Green's patent invalid because of the use of the invention.by those persons more than two years before he applied for his patent."

The court then goes on to review a large number of cases and says, page 715 of 124 U. S., page 684 of 8 Sup. Ct. (31 L. Ed. 557):

"The review we have given of the cases now cited on behalf of the appellants shows no adjudication by this court on the question involved, and a direct adjudication as to the effect of the second clause of the seventh section of the act of 1839, in accordance with that contended for by the appellants in only four cases in Circuit Courts (not including Andrews v. Carman. Fed. Cas. No. 371). To the contrary effect is the case of Egbert v. Lippmann, 15 Blatchf. 295, Fed. Cas. No. 4,306, commented on in the former opinion, 123 U. S. 270, 271, 8 Sup. Ct. 101, 31 L. Ed. 160."

Then, at pages 718 and 719 of 124 U. S., pages 685 and 686 of 8 Sup. Ct. (31 L. Ed. 557), on the question of the public use being with the consent and allowance of the inventor, the court says:

"The most plausible argument presented on the part of the appellants is, that, under sections 6, 7, and 15, Act July 4. 1836, c. 357. 5 Stat. 119, 123, a patent was invalid if the thing invented had been in public use or on sale, with the consent and allowance of the inventor, prior to his application for the patent; that section 7 of the act of 1839 was intended only to limit the effect on the validity of the patent of the acquisition of single specimens of the patented invention; that the interests of purchasers or constructors of such specific articles were the sole objects of that section; that the second clause of the section was intended only to provide that the patentee should hold his right against the general public unless there was proof of abandonment by him, or unless the purchase, sale, or prior use by or to individuals who had acquired such specific articles had been for more than two years prior to the application for the patent; that in this respect alone were the provisions of the act of 1836 intended to be modified; and that a defendant, in order to show the invalidity of a patent, under section 7 of the act of 1839, must show that he claims exemption from liability to the patentee because he purchased or constructed a specific article covered by the patent prior to the application therefor, and must show that the invention was abandoned, or that the purchase, sale, or prior use, or construction of the specific article occurred more than two years before the application for the patent, and with the consent and allowance of the inventor."

The opinion concludes:

"The second clause of the seventh section seems to us to clearly intend that, where the purchase, sale, or prior use referred to in it has been for more than two years prior to the application, the patent shall be held to be invalid, without regard to the consent or allowance of the inventor. Otherwise the statute cannot be given its full effect and meaning."

When the case was first before the court, Andrews v. Hovey, 123 U. S. 267, 8 Sup. Ct. 101, 31 L. Ed. 160, the court thoroughly discussed the same question with the same result, and also section 4886, Rev. St. (U. S. Comp. St. 1901, p. 3382), which embodies section 24, Act July 8, 1870, c. 230, 16 Stat. 201, which act took the place of the former law, and said:

"The language of section 24 of the act of 1870, now section 4886 of the Revised Statutes, is to the same effect, and carries out the policy inaugurated by the act of 1839. * * * In view of the fact that * * *, and of the further fact that section 24 of the act of 1870 re-enacts the second part of section 7 of the act of 1839, and does not contain a requirement that the public use or sale for more than two years prior to the application shall have been with the consent or allowance of the patentee in order to invalidate the patent, it may fairly be said that it was the view of Congress that section 7 of the act of 1839 did not require, as an element, the knowledge, consent or allowance of the applicant."

In Gill v. United States, 160 U. S., at page 430, 16 Sup. Ct., at page 324 (40 L. Ed. 480), the court quotes and approves Shaw v. Cooper, 7 Pet. 292, 323, 8 L. Ed. 689, where it was held:

"Whatever may be the intention of the inventor, if he suffers his invention to go into public use, through any means whatsoever, without the immediate assertion of his right, he is not entitled to a patent."

In Manning v. Cape Ann Isinglass & Glue Co., 108 U. S. 462, 465, 2 Sup. Ct. 860, 863, 27 L. Ed. 793, the court calls attention to the change in the law made by the statute of 1870 (16 Stat. 201, § 24), now section 4886, Rev. St., and said:

"It is the policy of the patent laws to forbid the issue of a patent for an invention which has been in public use before the application therefor. The statute of 1836, 5 Stat. 117, § 6, did not allow the issue of a patent when the invention had been in public use or on sale for any period, however short, with the consent or allowance of the inventor; and the statute of 1870—16 Stat. 201, § 24 (Rev. St. § 4886)—does not allow the issue, when the invention had been in public use for more than two years prior to the application, either with or without the consent or allowance of the inventor."

In Elizabeth v. Pavement Co., 97 U. S. 126, 135, 136, 24 L. Ed. 1000, the court, per Mr. Justice Bradley, discussed what constitutes public use that will defeat a patent. He said, in substance, that there are cases where long trial is necessary; and (page 135 of 97 U. S., 24 L. Ed. 1000):

"So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent. * * * But if the inventor allows his machine to be used by other persons generally, * * * then it will be in public use * * * within the meaning of the law. * *. * Had the city of Boston or other parties used the invention by laying down the pavement in other streets or places, with Nicholson's consent and

allowance, then, indeed, the invention would have been in public use, within the meaning of the law."

This was in 1877, while Andrews v. Hovey was in 1887, and after the limitations now a part of the Revised Statutes.

In the case now under consideration, conceding that Hentschel invented this composition—and the evidence shows he did not—it was completed, as fully completed as ever it was, in 1896 or 1897, and in actual public use by others, and he made no objection and did not apply for a patent until September, 1902. When this prior public use was shown, the burden was placed on complainant to show by full, complete, substantial, and convincing evidence that the delay in applying for a patent was for the purpose of perfecting an incomplete invention by tests and experiments. Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 249, 264, 8 Sup. Ct. 122, 31 L. Ed. 144; Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 492, 11 Sup. Ct. 846, 35 L. Ed. 521. This the complainant has wholly failed to do. In Smith & Griggs v. Sprague, supra, the court said:

"In considering the evidence as to the alleged prior use for more than two years of an invention, which, if established, will have the effect of invalidating the patent, and where the defense is met with by the allegation that the use was not a public use in the sense of the statute, because it was for the purpose of perfecting an incomplete invention by tests and experiments, the proof on the part of the patentee, the period covered by the use having been clearly established, should be full, unequivocal, and convincing."

And in Clark Thread Co. v. Willimantic Co., the court said:

"We conclude, therefore, that there is no proof on which reliance can be placed that Conant made his alleged invention before the publication of Weild's patent in England. After Weilds' patent was introduced into the case, showing with certainty the date of its publication, and such date anterior to the issue of Conant's patent, it was incumbent on the plaintiffs, in rebuttal, to show, if not with equal certainty, yet to the satisfaction of the court, that Conant's invention preceded that date. St. Paul Plow Works v. Starling, 140 U. S. 184, 11 Sup. Ct. 803, 35 L. Ed. 404, decided at this term."

Gast, when called by complainant in rebuttal, said he came from Germany in 1890, where he had been foreman in a sulphite and paper mill, and went to work for the Hudson River Pulp & Paper Company, at Palmer Falls, N. Y. That all digesters in Germany of which he had any knowledge were lined with lead only; that when he arrived at Palmer Falls the mill was not complete, and the digesters installed were lined with lead, bricks laid in cement, and that after running about six weeks the joints were pointed with litharge mixed with glycerin. That the digesters were constantly out of repair, leaking, and being repaired. This was the condition according to his testimony down to 1899 or 1900, when he says that Hentschel gave him the idea of his mixture mentioned in his patent.

"Q. 46. Did you experiment with different compositions to remedy these troubles? A. No, until Mr. Hentschel gave me that idea of his mixture mentioned in the patent. Q. 47. Can you state about how long it was before you commenced to test the composition in digester No. 2 that Mr. Hentschel first gave you the idea—that is. first told you—what his composition was? A. I can't remember the exact date, but it must be 1899 or in the very first days of 1900."

It appears, therefore, that Hentschel, giving credit to this testimony, knew of his composition prior to 1899 or early in 1900, for he then told Gast what it was. There is no evidence of any change in that composition. August 11, 1898, digester No. 4 had been relined, for it was started on that day. Digester No. 5 had been relined and started about the middle of June, 1898. Digester No. 3 was down for relining April 3, 1899, and ready and started August 14, 1899. These were at Palmer Falls. In addition to the evidence of Hall and Connors, James Rogers of the Rogers Mills testifies to the use of litharge, glycerin, and cement mixed together, and silicate of soda was used in mixing the mortar. The date of the use of the composition at Rumford Falls is fixed as March, 1901, by memoranda made on a door at the time and produced and put in evidence. It can be said that there is no proof that in these earlier uses of these materials they were mixed in the manner and in the proportions indicated in the patent in suit. This I think is true, but all the materials or their equivalents were used and mixed together for lining digesters, laying the brick and pointing seams, etc. There is no evidence in this case rising to the dignity of proof that the defendant has used the composition described in the complainant's patent. There is proof that it used a mixture for laying brick which on analysis was found to contain the materials of complainant's composition, except one, but not in his proportions. It seems from the evidence of Mallery that defendants' digester was lined with a Non-Antem lining, lead next the shell, and then brick laid up in some kind of cement. This brick was taken out, but the lead left. Then defendant put a coat of plaster composed of sand, cement, silicate of soda, and water on the old lead to the depth of about one inch and a half. A wall of brick was then laid up about three-fourths of an inch from the coat of plaster, and the space between the plastering and the brick wall was filled with a grout of sand, cement, silicate of soda, and water. This grout hardens like stone, forms an artificial stone, as is fully shown by the prior art, under the influence of the silicate of soda. There is no infringement in the use of these brick, or of this plaster or this grout. But the brick were laid up in a composition handed in to him and which on analysis by Prof. Ellery was found to contain the following:

Lead oxide or litharge, 35.15 per cent. (patent calls for 30 per cent.); glycerin, 17.19 per cent. (patent calls for 32 per cent.).

He also found: Iron and aluminum oxide, 3.05 per cent.; silica, 20.74 per cent.; lime carbonate, 21.17 per cent.; magnesia, .127 per cent.; sulphuric anhydride, .339 per cent.; alkali, .967 per cent.; water, 1.147 per cent.

This witness says that the ingredients usually found in Portland cement are iron, aluminum oxide, silica, lime carbonate, magnesia, sulphuric anhydride, and alkali. As the Portland cement uses up everything he found except the lead oxide, glycerin, and water, and as water is not silicate of soda, I do not find the slightest warrant in this analysis for a conclusion that the composition used by the defendant for laying brick ever contained any silicate of soda whatever.

Portland cements are now made in many varieties and of many differ-

ent ingredients, and where the same ingredients are used by different makers the quantities vary greatly, as various published works tell us and as the witness admits. See 4 Amercian Cyclopedia, "Cements." There is an absence of proof that defendant in making its mortar for laying brick used all the materials or ingredients of complainant's composition, and, clearly, the proof shows that if used they were not used in substantially the proportions named in the patent. The witness failed to point out how or why he concluded that silicate of soda was used in mixing defendants' composition used as mortar in laying the brick. Had he made a chemical analysis of Portland cement, he would have found everything he did find except lead oxide and glycerin. Lead oxide and glycerin do not show the presence of silicate of soda.

Infringement must be proved. It cannot be surmised. It is not enough to produce testimony sufficient to set the court guessing and speculating and surmising.

To establish infringement, it was necessary for the complainant to prove that defendant used a mixture composed of litharge, Portland cement, quartz, or crushed fire brick, glycerin, and silicate of soda. These materials or equivalent materials must have gone into the mixture or composition. Defendant did not infringe by using a composition containing Portland cement and the other materials named, leaving out silicate of soda, on the theory that, as Portland cement contains magnesia, carbonate, and silicate, therefore such substitute composition contains the chemical equivalents of the patented composition. This patent makes Portland cement an essential element, and quartz or sand, its equivalent, or crushed fire brick, an essential element. It also makes silicate of soda an essential element. The different materials named are to be combined, and if any one of them is left out in making the composition there is no infringement unless an equivalent material is substituted. It is not enough, with these claims as they are, that a larger quantity of Portland cement is just as good and better than the sand or quartz, or that much less cement and more sand will answer, or that silicate of soda may be omitted for the reason that Portland cement on analysis shows the same chemical ingredients. As a whole they are not equivalents. As to some of their chemical elements they are. Hentschel had the right to name the different materials that should make up his composition, and he has. Take the materials making up the complainant's composition and mix them together in the manner indicated, allow them to harden, and then analyze them. Is there proof here as to what would or should be found on making the analysis? Are we to assume that we would find the same chemical elements in the same quantities as would be found on making an analysis of the original materials or ingredients? Analyze a mixture of Portland cement and quartz and litharge and glycerin, would we find anything different from what was found? Would we find anything lacking that Ellery found? He could have named the chemical ingredients and their proportions that should make up his composition, but he did not. It is true that the witness Ellery says that the chemical results of mixing either quartz,

sand, or crushed fire brick with litharge, glycerin, silicate of soda, and Portland cement would be exactly the same (which is true except in degree), but that the chemical analysis would not be the same. This every one ought to know. There is nothing to show that silicate of soda was used in mixing defendants' mortar with which it laid the brick in its digester. William Warwick, who did the mixing of the mortar in question, and who alone knew and knows its ingredients, was not called as a witness. He was not shown to be in the employ of the defendants. No burden of proof was cast on defendants to show the composition used to lay the brick, as the complainant failed to show even a probable use by defendants of the materials of the patent in suit. It is true that Gast said the materials used at the defendants' mill was litharge, Portland cement, quartz or brick, glycerin, and silicate of soda. But he says his knowledge was from seeing, feeling, and tasting. He did not see the materials separately.

The complainant's brief contains this statement:

"It is true that Hentschel's composition was used in one digester more than two years prior to his application for a patent, but, as has already been shown, this was an experimental use; that in order to test it to see whether or not the composition would stand the great and severe strain to which it would be subjected it was necessary to actually line a digester with it and give it a trial. This was done in digester No. 4 at the Palmer Falls Mill in the summer of 1900, and the digester was started up July 27, 1900. The entire testimony in reference to it shows that it was an experimental use only. Mr. Gast went to the officers of the company and obtained permission to use it in the one digester."

It seems strange that Hentschel, the alleged inventor, took no part in this experimentation, if it was such. He made no requests to make experiments. He made no request that his discovery be kept secret. He communicated it to Gast, and, as we have seen, to Hall and Connors, and all commenced its use at about this time on complainant's own showing, but Hall and others did not confine their use of it to experiments. The complainant has not sustained the burden of showing that this conceded use of the composition in the early summer of 1900, more than two years prior to the filing of the application for a patent, was an experimental use. That it was experimental was suggested to Gast in substantially every question put to him.

"Q. 3. C. R. 71. Can you state when you first made experiments for Mr. Hentschel, or under his directions, of compositions containing the ingredients named in the patent? * * * Q. 4. Please describe such experiments? * * * Q. 9. When was the first experimental digester lined at Palmer Falls with the Hentschel composition? * * * Q. 16. Was the composition used in this digester entirely as an experiment to test the composition and see if it was successful or not?" etc.

In answer to question 4 (C. R. 72) he said:

"As soon as he told me his idea, which I found and thought it must be a success, I commenced to patch up, where there was a chance, an old Non-Antem digester lining which was very poor at that time, wherever I could, and I found that it was very durable. Q. 5. When was that? A. It was in 1900, or previous to that."

I do not find in all the evidence a suggestion that Hentschel and Gast, or that Hentschel and any other person, ever discussed the subject of

applying for a patent until about two years from July, 1900, when Gast says Hentschel told him to apply for one.

"Q. 21. Page 75, C. R. How long was it in use before either you or Mr. Hentschel to your knowledge pronounced it a success? A. After examining the same quite often during that time until about two years. Mr. Hentschel told me to apply for a patent."

No caveat was filed. Gast says that as soon as Hentschel told him his idea he commenced its use and "found it very durable." This was in 1900 or before that, and, as we have seen, later he puts the time in December, 1899, or the spring of 1900. That spring, such was their satisfaction that an entire digester was shut down May 25th, lined and completed and put to work on July 27th, and it was two years and two months after that that the patent was applied for. In the meantime Hall and others were using this very composition in lining digesters. If Hentschel and Gast were waiting, it was not with any idea of perfecting the composition. It had not shown any defects.

I think the following cases decisive that this was not an allowable delay for mere experiment or to perfect the invention: Root v. Third Avenue Railroad, 146 U. S. 210, 215, 216, 223, 224, 13 Sup. Ct. 100, 36 L. Ed. 946; Worley v. Tobacco Co., 104 U. S. 340, 343, 344, 26 L. Ed. 821; Hall v. MacNeale, 107 U. S. 90, 97, 2 Sup. Ct. 73, 27 L. Ed. 367; Egbert v. Lippman, 104 U. S. 333, 26 L. Ed. 755; Brush v. Condit, 132 U. S. 39, 48, 49, 10 Sup. Ct. 1, 33 L. Ed. 251; Eastman v. Mayor, etc., of City of N. Y. (C. C. A., 2d Circuit) 134 Fed. 844, 857, 858, 859, 69 C. C. A. 628.

In Eastman v. Mayor, etc., 134 Fed. 858, 859, 69 C. C. A. 642, 643, the court, per Coxe, C. J., laid down certain rules or conclusions, viz.:

"First. An inventor has a reasonable time in which to experiment for the purpose of perfecting the invention and demonstrating its utility.

"Second. The time thus spent, if in good faith, is no part of the two-year statute of limitations.

"Third. The experiments must be made in perfecting the invention as described and shown.

"Fourth. Experiments made in testing parts of the machine not covered by the invention will not have the effect of extending the two-year period.

"Fifth. As soon as the invention is completed, viz., 'in such a condition that the inventor can apply for a patent for it,' the two-year period begins to run, and the application must be made within this period.

"Sixth. The fact that the invention has been improved since its original embodiment does not demonstrate that it was then embryonic or incomplete.

"Seventh. When a clear case of prior public use is established, the burden is on the inventor to prove by a convincing proof that the use was experimental."

This composition was in a condition for patenting early in 1900. It was then demonstrated that it was acid-proof and durable. It had been used and tested a long time in repairing and relining digesters, and always with success. It had been pronounced a success by Hall, and he had directed its use in other digesters. July 27, 1900, as a result of trials and tests, a digester completely lined with it was put to work, but this patent was not applied for until September 16, 1902, two years and about two months thereafter, and during that time there was no sign of weakness, no giving way, no leakage, no defect, no change of

the composition. Two years' trial in a digester fully lined with it was not necessary. Hentschel could not prolong the limitation by arbitrarily saying that two years was necessary to demonstrate the durability of the composition. That could be determined, and had been determined, by the use made of it long before, commencing in 1899 or early in 1900. Apply rule 5 laid down by the learned court in the Eastman Case and the complainant's case falls. As was said by Judge Coxe in the Eastman Case, Hentschel "was not justified in delaying his application until the invention had reached a stage where improvements were no longer possible." In that case the court held:

"The use of an unpatented invention upon a machine in actual service, continued for years without any change therein, although it may have been experimental in the beginning, becomes a public use from the time the success of the invention is demonstrated, and a patent therefor issued on an application filed more than two years after such time is invalid."

Here, the use of the fully lined digester completed and put to work July 27, 1900, was not experimental in the beginning, for it was so lined as the result of the prior use of the composition in relining digesters out of repair and the demonstrated success attending it. In the Eastman Case the application was filed May 13, 1864, and Judge Coxe said (page 846 of 134 Fed., page 630 of 69 C. C. A.), "So that a well-established case of public use prior to May 13, 1862, will invalidate the patent." And at page 857 of 134 Fed., at page 641 of 69 C. C. A., it was found that the patent was perfected in January, 1862, for the reason Knibs said, "As soon as I saw the successful working of it on the J. C. Osgood I applied to Mr. Norton as to what course to pursue." Can there be any question here that Hentschel was in a position to apply for a patent on this composition actually tested for months and proved a success even before it was put in the digester in May, 1900? In Hall v. MacNeale, the court said (page 97 of 107 U. S., page 79 of 2 Sup. Ct. [27 L. Ed. 367]):

"The invention was complete in those safes. It was capable of producing the results sought to be accomplished, though not as thoroughly as with the use of welded steel and iron plates."

In this case the composition had been proved to be capable of performing its function, resisting the acid in a digester in actual operation. Gast says he was sure it was a success and found it to be a success even before a digester was wholly lined with it. In Worley v. Tobacco Co., at page 343 of 104 U. S., 26 L. Ed. 821, the court said:

"In 1871 his invention was complete, and in his opinion successful, and was adhered to from that date without change."

There, as here, there were further experiments.

In Root v. Third Avenue Railroad, supra, the invention was for the construction of cable railways. The statement of the case contains the following:

"In explanation of his delay in applying for the patent, he testified that, before he began the construction of the road, one of the projectors expressed a doubt in regard to the durability of such a structure, and a fear that the jar of street traffic, as well as that of the cars, would in time loosen the ribs and separate them from the surrounding concrete, and the structure

would thus fail; that doubts were expressed also by others; that, while the plaintiff believed that there was more than an even chance of its proving a durable and desirable structure, he still had some doubt in his own mind, which was somewhat increased by the doubts expressed to him by others, in whom he had confidence; that, as causes which would contribute to the destruction of the road, * * * and that there was, no way of determining these matters but by a trial in a public street through a long period of time.

"He was asked whether his own doubts as to the durability of the structure were present at any time after the road was in operation, and if so, when, and by what they were caused. He answered 'Yes,' and said that during the spring of 1879 the road was extended from Fillmore street to Central avenue by a wooden structure not nearly so durable or costly as the original road; that in preparing for the extension he had occasion to dig out and around, so as to expose some of the old structure; that he saw therein some indication of the loosening of the yokes in the concrete; and that he had some little fear at that time that some trouble might arise in that respect. He further testified that the reason he did not apply for the patent within two years from the time when he first put the structure into use was that, if it proved weak or undesirable, he did not want any patent; and he did not feel certain enough of that fact until the year 1881.

"But it did not appear that he expressed his doubts to the projectors of the road, either before its construction was commenced, or during its construction, or while he remained its superintendent after it was completed; or that he communicated to any one what he noticed during the spring of 1879, or that he entertained any fear arising therefrom."

The court, in examining and commenting on the Nicholson Paving Case, said:

"This court held that, if the invention was in public use or on sale prior to two years before the application for the patent, that would be conclusive evidence of abandonment and the patent would be void; but that the use of an invention by the inventor, or by any other person under his direction, by way of experiment and in order to bring the invention to perfection, had never been regarded as a public use of it. * * * So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent. * * * But if the inventor allows his machine to be used by other persons generally, either with or without compensation, or if it is with his consent put on sale for such use, then it will be in public use and on public sale within the meaning of the law. * * * The proprietors of the road alone used the invention, and used it at Nicholson's request, by way of experiment. The only way in which they could use it was by allowing the public to pass over the pavement. Had the city of Boston, or other parties, used the invention, by laying down the pavement in other streets and places, with Nicholson's consent and allowance, then, indeed, the invention itself would have been in public use, within the meaning of the law; but this was not the case."

Then turning to the case under consideration, the court said:

"It cannot be fairly said from the proofs that the plaintiff was engaged in good faith, from the time the road was put into operation, in testing the working of the structure he afterwards patented. He made no experiments with a view to alterations; and we are of opinion, on the evidence, that sufficient time elapsed to test the durability of the structure, and still permit him to apply for his patent within the two years. He did nothing and said nothing which indicated that he was keeping the invention under his own control."

Applying all this to the case in hand, and we find that Hentschel made his invention known to others, Hall and Connors, and imposed no secrecy. They went to using it, as did Gast, and various digesters were pointed up with it and in part relined. Results were satisfactory to all.

Hall and Connors used it at other and distant points more than two years before the patent was applied for in lining digesters. They were doing it for the company they represented, and not for or under the direction of Hentschel. Hentschel allowed them to do this. He did not file a caveat. He made no experiments with a view to changes. Hentschel said nothing and did nothing to indicate that he was keeping his invention under his own control. This court has examined this case in all its aspects, and given careful consideration to the arguments of complainant's counsel, reading all the evidence. The evidence has failed to satisfy me that Hentschel had anything to do with the invention of the composition. But, conceding that he did, and would have had a valid patent had he applied in time, on the evidence of complainant, and especially on the whole evidence, I am convinced beyond all doubt that the composition was in public use and permitted by Hentschel to go into public use more than two years prior to the filing of the application for a patent, and that the patent is void. But conceding its validity, the proof is not sufficient to establish infringement.

There will be a decree dismissing the bill, with costs.