DE LASKI & THROPP CIRCULAR WOVEN TIRE CO. et al. v. FISK RUBBER CO.

(Circuit Court of Appeals, First Circuit. March 11, 1913.)

No. 995.

1. PATENTS (§ 328*)—ANTICIPATION—APPARATUS FOR MANUFACTURING PNEUMATIC TIRES.

The Thropp patent, No. 822,561, for apparatus for manufacturing tires for automobiles, is void for anticipation by an apparatus in use in Akron, Ohio, prior to the alleged invention by the patentee.

2. PATENTS (§ 312*)—ANTICIPATION—EVIDENCE.

The rule referred to that, to sustain the defense of anticipation in a patent case, by a prior use of another, where there has been a considerable lapse of time, the testimony must be clear, unequivocal and convincing.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 544–549; Dec. Dig. § 312.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the District of Massachusetts; Arthur L. Brown, Judge.

Suit in Equity by the De Laski & Thropp Circular Woven Tire Company and others against the Fisk Rubber Company. Decree for defendant, and complainants appeal. Affirmed.

For opinion below, see 198 Fed. 125.

John P. Bartlett and E. Clarkson Seward, of New York City (Emery & Booth, of Boston, Mass., and Wm. McK. Barber and Brown & Seward, all of New York City, on the brief), for appellants.

William K. Richardson, of Boston, Mass. (William Quinby and Marcus B. May, both of Boston, Mass., on the brief), for appellee.

Before DODGE, Circuit Judge, and ALDRICH and HALE, District Judges.

HALE, District Judge. The decree from which this appeal is taken dismissed a bill brought in the District Court by the complainants, the appellants in this court, against the defendant, the appellee, alleging infringement of claims 1 and 2 of letters patent No. 822,561, to P. D. Thropp, for apparatus for manufacturing wheel tires. The District Court held these claims to be invalid by reason of anticipation. The claims are:

"1. Tire-forming apparatus comprising an annular core or mandrel, annular pressure-rings arranged to engage the clencher edges of the tire, leaving the outer body portion of the tire exposed, and means for forcing the pressure-rings into a predetermined position with respect to the core or mandrel.

"2. Tire-forming apparatus comprising an annular core or mandrel provided with an inwardly-extending rib, pressure-rings arranged to engage the clencher edges of the tire on opposite sides of the said rib, leaving the outer body portion of the tire exposed, and means for forcing the pressure-rings against the opposite sides of the rib."

The patent states that its invention relates more particularly to apparatus holding a clencher tire in position during the vulcanizing process. The invention does not consist in the process of making a tire, and does not assert any novelty in such process. The apparatus, which forms the subject of the patent, is a mold. The three elements in the patent are: First, the annular core, or mandrel, with an inwardly-extending rib; second, the pressure-rings, which are often spoken of as the "mold-sections"; third, the bolts, or means for forcing the pressure-rings against the opposite sides of the rib. The pressure-rings, to which we have alluded as the second element of the patent, engage the clencher portion of the tire, "leaving the outer body portion of the tire exposed." These words involve the feature of novelty claimed in the patent. This feature is contrasted with the closed mold-sections surrounding the entire tire, and not merely the inner or clencher portion. The specification describes the use of the open mold:

"In operation, the several elements of the tire having been placed in position on the core and the pressure-rings forced into position by the bolts, filling-rings of wedge shape in cross-section are placed against the sides of the tire above the thick edges and of the pressure-rings, and the whole is wound with a wrapping of tape, the filling-pieces serving to impart the pres-

sure of the winding tape to the sides of the tire to hold the latter in position during the vulcanizing process."

The apparatus in question is used in curing or vulcanizing the tire. In vulcanization the tire has to be subjected to great heat. By that process the rubber of the tire is changed from a soft to a solid condition. There were two methods of vulcanizing tires: In the closed-mold method the casing of the tire was built up on a circular core, and then inclosed by a two-part metallic mold, which, when drawn into place, left a space between it and the core. This space was of the exact dimensions intended for the finished tire. The tire was then "cured" or "vulcanized" in the single cure. A sort of fin was formed on the center of the tread of the tire, where the rubber flowed outward, while still soft, between the two halves of the mold. This fin was afterwards cut or rubbed off to some extent.

The other method was the so-called "open cure." It is described as consisting in building up the tire, as in the closed-mold method, on an annular core, and then wrapping it around with fabric so as to retain it in shape on the core, instead of inclosing it in a metal mold. This fabric or tape was wound spirally around the annular sheet on the core. After vulcanizing, the imprint of the wrapper is left on the outer surface of the tire; and this is thought by many to be a desirable feature.

The method just described has sometimes presented another form of operation known as the "two-cure, wrapped-tread method." Here the so-called "carcass"—the inner portion of the tire, excluding the "tread"—was first semicured in a closed mold, before the whole tire, consisting of the carcass and tread, was built up, wrapped, and given an open cure. In either the single-cure or the two-cure process the whole tire is built up on a metal core, bound with a wrapping tape, and vulcanized by open heat; and whether or not the inner portion of the tire, called the carcass, has been semicured before the wrapped-tread vulcanizing process appears to be a matter of detail in the manufacturing process. It apparently makes no difference, so far as the final curing by the wrapped-tread method is concerned, whether the method is one-cure or two-cure. The apparatus claimed by the patentee may be used in either process.

Prior to the patent in suit, the tire-forming apparatus did not leave the outer body portion of the tire exposed. The outer mold-sections, or pressure-rings, continued around the whole outer portion of the tire, completely inclosing it. The novel feature claimed by the patentee is found, as we have said, in the words, "leaving the outer body portion of the tire exposed." Mr. Livermore, an expert called by the complainant, has clearly drawn the distinction between the two kinds of molds. He was asked with reference to certain illustrations of the closed molds, and answered:

"The apparatuses referred to in the question are all examples of closed molds in which the outer mold-sections completely inclose the outer surface of the tire, including both the tread portion and the inner portion extending from the tread portion to the clencher edges or parts that are secured in the wheel rim when the tire is in use.

"These apparatuses are therefore all substantially different from the apparatus forming the subject of the Thropp patent, an important characteristic of which is that the pressure-rings or outer mold-sections inclose only the inner part of the tire body, viz., the part extending from the tread portion to the clencher edges, leaving the outer or tread portion exposed, so far as the rigid molds are concerned, but adapted to be confined and supported by a cloth wrapping, so that the apparatus of the Thropp patent produces what is known as a 'wrapped-tread' tire, as distinguished from a molded tire, produced by the apparatus referred to in the question."

It is claimed that the "open-mold" apparatus is more effective than the other, and that thereby the manufacture is conducted with more speed and economy, and produces a better quality of the product, for the reason that it avoids pinching and buckling. An important difference between the tire formed in the closed mold and the tire formed in the open mold is that the closed-mold tire has a smoothly-finished surface, while the open-mold tire bears marks of the fabric wrapper upon its tread portion. This advantage appears to appeal to manufacturers and to the public.

An added utility was obtained in the mold of the patent by the use of so-called "fillers." The specification refers to the outer edges of the pressure-rings as being quite thick, in order to make them firm; and it then alludes to the use of wedge-shaped filling-rings placed against the sides of the tire, above the thick edges of the pressure-rings, in order to "impart the pressure of the winding tape to the sides of the tire, to hold the latter in position during the vulcanizing process." These filling-rings are used with the blunt-edged pressure-rings. Mr. Livermore has said that they are not regarded as essential, and they are not mentioned in the claims in suit; but they are referred to in the specification, as preventing any tendency on the part of the tire material to flow to the points where the strain on the tire is severe. The patent shows and describes no other construction than one in which pressure-rings, having blunt upper edges and filling-pieces, are employed. Its claim 3, not in suit, is limited to this particular construction; claims 1 and 2 may cover either the construction shown in the patent itself, or one wherein the pressure-rings are reduced to a thin upper edge. The use of "fillers" becomes of some importance when we come to the question of anticipation.

In interference proceedings Thropp, the patentee, filed a sworn statement in the Patent Office on March 12, 1907, alleging that he conceived the invention, and first made a drawing of it, about February 1, 1905; that he disclosed the invention to others about March 1, 1905; that he made a full-sized working model of the invention about July 15, 1905; and that he reduced the invention to practice about July 20, 1905. We must, then, consider the date of the inventive thought of the patentee to have been February 1, 1905.

The testimony as to the state of the art at this time is quite complete. On this issue the learned judge who heard the case in the District Court said:

"It seems unnecessary upon the question of anticipation to refer specifically to devices other than the devices proved in the Akron defense, further than to say that they thoroughly established the fact that the single-cure, wrapped-tread process was familiar in the art, and therefore that the patent

in suit cannot be construed with the breadth that would be given to it if it were for the first apparatus which embodied this method of curing tires."

The whole record establishes that it was familiar knowledge in the art at this time that a clencher-edge tire could be formed, and its distinctive shape given to the edge in a closed metallic mold; that, if it were desired to imprint a fabric mark on the tread, the tire could be wrapped in fabric and cured by a single "open cure." The inventive thought of the patent in suit was involved in giving the clencher edges the exact shape conferred by a metallic mold, and, at the same time, imprinting the fabric mark on the tread. This was done by removing the outer parts of the mold-section; so that the mold would embrace only the clencher part of the tire.

On the issue of anticipation it is contended by the defendant that from January to April, 1905, B. F. Goodrich & Co., of Akron, Ohio, used commercially for the manufacture of tires a number of "open heat molds," embodying the entire construction set forth in the claims of the patent in suit. The record shows a great volume of proofs, referred to in this case as "the Akron evidence." It appears from such proofs that some weeks previous to February, 1905, drawings for molds were made by the B. F. Goodrich Company, which we shall refer to as the Goodrich Company. The original drawings, indorsed "Open Heat Mold, 4½ Baker Special," dated December 22, 1904, and "Mold for Open Heat Fillet, 4½ Baker Special," dated December 23, 1904, were identified by a draftsman, then in the employ of the Goodrich Company, who made the drawings, and wrote the numbers and dates on the drawings, and whose initials appear on them. The drawing which we have first named shows two annular pressure-rings engaging the clencher edges only, an annular core or mandrel and means for forcing the pressure-rings against the rib of the core. The second-named drawing shows a mold for making the filling-ring which was placed outside the blunt outer edges of the pressure-rings, like the filling-rings in the patent in suit. Six other drawings for different sizes, dated December 23 and December 24, 1904, were similarly identified by the same witness.

With reference to the making of the molds from these drawings, it appears from the proofs that on December 27, 1904, the Goodrich Company sent an order to J. K. Williams, president of the Williams Foundry & Machine Company, for one fillet mold, and these molds are described in the order. The original order is produced by Mr. Williams from his files. Williams also produced a similar order, of January 6, 1905, for three "open heat clencher molds" and certain fillet molds described. He also produced the company's original invoice book, wherein these two orders were entered. The entries in the invoice book are corroborated by the secretary of the company, who made them. The clerk of the Goodrich Company produced the original bills from the Williams Company for these molds—one dated January 7, 1905, paid January 13, 1905; the other dated January 20, 1905, paid January 30, 1905. He also produced the two checks of the Goodrich Company to the Williams Company in payment of those bills; the checks being severally dated January 13, 1905, and

January 30, 1905. The delivery of the molds is shown by distinct affirmative proofs. The "Mold Record Book" of the Goodrich Company is in evidence; in it all molds are entered when delivered to the Auto Tire Department. Under date of January 6, 1905, there is a record of "open heat mold, for making Goodrich clencher tire, size 36 by 4½." There are subsequent entries in January for molds for other sizes. Another mold record is kept by the assistant foreman of the Goodrich Company, who brought into court entries, in his own writing, previous to February 1, 1905, of molds for curing 36 by 4½ "Baker tires in open heat." The original cards from which the first entries were made, dated January 6, 1905, were produced by the foreman in the tire department, and are made a part of the record.

The order book of the Goodrich Company is produced, in which there appears an order from the Baker Motor Vehicle Company for four 36 by 4½ clencher cases "cure in open heat." It is indorsed on the order that they were delivered on January 10, 1905. The entry in the invoice book of the Goodrich Company indicates that this order was filled by the delivery of four tires January 10, 1905. A corresponding bill for the four Goodrich clencher tires is also produced by the purchase agent of the Baker Company. A certain witness testified that he was sent by the Goodrich Company to Cleveland with four 36 by 4½ tires, and put them on the wheels of one of the Baker Electric Company's cars. Other similar orders are also shown from the Baker Company on the books of the Goodrich Company. In regard to the actual use of the molds, the proofs bring before us the testimony of the department manager of the tire department of the Goodrich Company, under whose directions the drawings were made, that the molds made from these drawings were actually used in curing tires; that the tires were subjected to one cure; that the tread portion was covered by fabric, not by metal. The assistant foreman of the tire department testifies that the molds in question were used in making and curing tires in a "one-cure, wrapped-tread operation." He describes in detail how the molds and fillers were put together and used. It appears, also, that on account of a change in the style of tire these open heat molds were scrapped the year after, in November, 1906, and that a large number of the regular closed molds were disposed of at the same time. No proofs are offered by complainants to disprove the testimony to which we have adverted on the subject of the Goodrich anticipation.

The proofs lead us to the conclusion that the mold of the Goodrich Company was substantially the same thing as the mold covered by the patent. They disclose an absolute, independent use of such mold by the Goodrich Company. We do not undertake to refer to all the proofs which tend to establish the defense of anticipation. These proofs leave us in no doubt that all the elements of the patentee's claims in suit are found in the Goodrich mold. The concrete, visible, cotemporaneous proofs in the record are conclusive on this issue. The mold is clearly a tire-forming apparatus. It is a "cut-away" or "open" mold. It has, first, the annular core with the inwardly-extending rib; second, the pressure-rings arranged to engage the

clencher edges of the tire, leaving the outer body portion of the tire exposed; third, means for forcing the pressure-rings into a predetermined position with respect to the core. We do not regard it as very material whether the Goodrich mold was employed in connection with the two-cure process or with the one-cure process; upon all the proofs, however, we are satisfied that the tires were, in fact, made in Goodrich molds for the Baker Company by a single-cure, wrapped-tread process. The Goodrich mold shows the use of filling-rings in connection with the thick edges of the pressure-rings. These filling-rings are said by the patent to be necessary for reasons which we have. pointed out. Even though the filling-rings were not mentioned in claims 1 and 2 of the patent, it is clear that they were just as necessary in connection with the pressure-rings of the patent as they were with the pressure-rings employed by the Goodrich Company. We agree with the District Court that the patent in suit shows nothing patentable over the Goodrich structure, even if the complainants' pressure-rings were so constructed as to obviate the use of fillets.

It is contended in behalf of the complainant that the evidence relating to the Goodrich anticipation proves merely an abandoned experiment. We do not think so. All the proofs upon this issue lead us to the opposite conclusion. The molds were made by the Williams Company, and paid for at the full price. They were used for four months in the manufacture of open heat tires, which were delivered and paid for in the regular course of business. There is nothing to indicate any trouble with the work of the molds or any defect in the tires. The testimony tends to the clear conclusion that the molds were given a practical, commercial use; that such use was afterwards given up, and the molds themselves destroyed, because the style had changed, and from no reason justifying the conclusion that they were not practicable. In Brush v. Condit, 132 U. S. 39, 44, 10 Sup. Ct. 1, 33 L. Ed. 251, it appeared that a single clamp for a carbon lamp was made by one Hayes; that the Hayes clamp was run from time to time for several months, when a clutch "constructed upon a different principle" was substituted; and no other clutch was ever made. The court held that the question was whether the lamp, with the clutch, was used "merely to gratify curiosity, or for the purpose of experiment, to see whether the feeding device was successful," or whether it was put to use in the ordinary business of the mill as a complete thing; and the court held that the case was one of "public, well-known, practical use in ordinary work, with as much success as was reasonable to expect at that stage in the development of the mechanism." In United Shoe Machinery Co. v. Greenman, 153 Fed. 283, 288, 82 C. C. A. 581, 586, this court held that the case fell within the rule of Brush v. Condit. Speaking for the court, Judge Colt said:

"The evidence also shows that the clutch of the Stiles-Thompson machine was not used for purposes of experiment or to gratify curiosity, or to see whether it was successful, or whether anything more was to be done to perfect it, but that it was put to use in ordinary business as a thing which was completed, and that the reason why it was only used for a short time has no bearing on the question of its practical operativeness."

In the case at bar, we have been constrained to refer with some detail to the proofs on the question of anticipation; for we recognize that it is our duty to preserve the pecuniary value of a patent for a useful invention, unless we are clearly satisfied that the alleged anticipation is supported by concrete, visible, cotemporaneous proofs. In Emerson & Norris Co. v. Simpson Bros. Corporation, 202 Fed. 747,750, this court had the issue of anticipation before it. In the opinion of the court, handed down January 30, 1913, Judge Putnam reviewed certain cases upon this subject, and said:

"The result of all these cases is that, with reference to questions of the class which we have here, namely, the identity of structure as between what is patented and what is alleged to have anticipated it, something more than oral testimony, even of the highest character, is required where there has been a considerable lapse of time."

The cases reviewed were: Brooks v. Sacks, 81 Fed. 403, 407, 26 C. C. A. 456; Westinghouse Co. v. Stanley Co., 133 Fed. 167, 174, 68 C. C. A. 523; Maxwell Land Grant Case, 121 U. S. 325, 381, 382, 7 Sup. Ct. 1015, 30 L. Ed. 949; Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657; Greenwood v. Dover, 194 Fed. 91, 114 C. C. A. 169. In Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 11 Sup. Ct. 846, 35 L. Ed. 521, this issue was presented in a case where a patentee sought by proofs to carry back the date of his inventive thought to anticipate the defendant's anticipation. The court held it incumbent upon the patentee to show by substantial proofs, to the satisfaction of the court, that the invention had priority. In the cases to which we have referred, attention has been called to the practical safeguards which are deemed necessary against the frequently mistaken memory of witnesses as to events long passed. These cases show repeated refusals to sustain the defense of anticipation, in the absence of such testimony as book entries, illustrations, purchases, bills, orders, patterns. This is the kind of evidence which Judge Putnam refers to as "concrete, visible, cotemporaneous." We have pointed out that in the case at bar such proof of anticipation exists, and seems to us clear, unequivocal, and convincing.

The decree of the District Court is affirmed; and the appellee recovers the costs of this appeal.