**MONROE AUTO EQUIPMENT COM-
PANY, Plaintiff,**

v.

**HECKETHORN MANUFACTURING
AND SUPPLY COMPANY,
Defendant.**

**Civ. No. 3791.**

United States District Court
W. D. Tennessee, W. D.

Dec. 27, 1961.

Don K. Harness, Detroit, Mich., Walter Armstrong, Jr., Memphis, Tenn., for plaintiff.

Robert F. Conrad, Washington, D. C., M. Watkins Ewell, Sr., Dyersburg, Tenn., for defendant.

BOYD, Chief Judge.

This is an action for infringement of two patents brought by Monroe Auto Equipment Company against Heckethorn Manufacturing and Supply Company. The plaintiff Monroe is a corporation of Michigan with its principal place of business at Monroe, Michigan and is engaged in the manufacture of equipment used on automobiles including shock absorber devices. Heckethorn is a Colorado corporation which has its

principal place of business at Dyersburg, Tennessee and is also engaged in the business of manufacturing shock absorber devices for automobiles. The complaint alleges that Heckethorn has infringed United States Letters Patent No. 2,874,955 to McIntyre, et al., and No. 2,896,938 and No. 2,912,235 to Walker, all three of which had been assigned to Monroe prior to the commencement of this action. The complaint also alleges that Heckethorn has competed unfairly with Monroe in its advertising of devices of the kind to which the patents in suit relate, and in particular has copied certain portions of plaintiff's advertising and merchandising material.

The defendant, by way of answer, admits that plaintiff notified it concerning infringement of the mentioned patents, but denies said patents are valid or that they have been infringed by the defendant. Defendant also denies it has engaged in unfair competition with plaintiff or that its advertising and merchandising practices have caused any detriment or damage to the plaintiff.

This action as it applies to United States Letters Patent No. 2,874,955 to McIntyre was dismissed on plaintiff's motion before the trial.

At the trial plaintiff limited its charge of infringement to claims 2 and 3 of the '938 patent and claim 14 of the '235 patent.

The Court upon the pleadings, evidence and briefs of counsel, makes the following:

### FINDINGS OF FACT

1. Patent No. 2,896,938 relates to a device which is used in automobile suspension systems. The device, herein, consists of a conventional shock absorber disposed within a coil spring. The shock absorber consists of two parts, one being a body portion and the other a piston and rod. The piston rod telescopes into the body portion when the shock absorber is compressed. The ends of the coil spring are supported with respect to the relatively movable parts of the shock absorber Mounted on the shock absorber

between it and the spring is a sleeve of rubber or non-metallic material.

2. It is the addition of this sleeve to the shock absorber disposed with a coil spring that provides the basis for the combination claimed in claims 2 and 3 of the '938 patent.

3. The '938 patent was based on application No. 769,967 filed October 10, 1958 as a division of United States patent application No. 427,927 filed May 6, 1954 by Brooks Walker.

4. No. 427,927 was entitled "Spring Adapters for Shock Absorbers". In this original application all the stated objects of the invention were directed to the adapters which were used with the shock absorbers for the purpose of holding the ends of the spring in position thereon.

5. All nine claims in this original application were directed to the spring adapters, and none of the claims mentioned the non-metallic sleeve. Thirteen new claims were added by amendment on April 5, 1955. All these claims were again directed to the spring adapters, and none mentioned the non-metallic sleeve. All claims in the application were rejected by the Patent Office on August 2, 1956 and ten new claims were subsequently added by amendment on January 28, 1957. Again, all ten claims were directed to the spring adapters, and no reference was made to the non-metallic sleeve.

6. During May of 1957, the plaintiff marketed its commercial device under the trade name "Load Leveler" which is the same as the device in suit herein. Subsequently, in an amendment filed October 25, 1957, claims for the first time were inserted in the original application which made reference to a rubber or non-metallic sleeve. These were claims 35 and 37, the addition of which claims was accompanied by the comment:

"New claims 35 and 37 are directed to the non-metallic sleeve between the spring and a main portion of the shock absorber. * * * "

In a proceeding dated June 3, 1958, the Patent Office refused to consider

claims 35 and 37 in application No. 427,-927 because they covered a structure different than that which the applicant had earlier elected to prosecute in his application.

7. On October 10, 1958, a divisional application was filed in the Patent Office which became No. 769,967 on which the '938 patent in suit is based. This application was identical to the original application Serial No. 427,927, having the identical title, the identical disclosures and the identical claims, all being directed to "Spring Adapters for Shock Absorbers."

This divisional application was accompanied by an amendment of October 10, 1958, which introduced as claims 10 and 11 being former claims 35 and 37 of application No. 427,927.

8. Claims 10 and 11 were rejected by the Patent Office on March 2, 1959 as unpatentable over prior art which showed non-metallic sleeves between a shock absorber and a surrounding coil spring.

9. On May 20, 1959 Walker filed a further amendment containing major revisions in the specification and also three new claims 14, 15 and 16 which subsequently became claims 2, 3 and 4 of the '938 patent. These claims met the Examiner's objection that the non-metallic sleeve as broadly claimed did not distinguish over the prior art, by particularizing the nature of the material of the non-metallic sleeve.

The words and phrases which were used to particularize the character of the sleeve were introduced for the first time in the history of both applications Nos. 427,927 and 769,967 by this amendment.

10. The claims 14 and 15 (claims 2 and 3 of the '938 patent) are identical in language to two claims which the plaintiff had abandoned on November 20, 1958 in its McIntyre application which later issued as patent No. 2,874,955.

11. At the time of the amendment of May 20, 1959, the plaintiff's "Load Leveler" had been on the market for more than a year (May 1957) and embodied each of the features as set out in claims 2 and 3 of the '938 patent.

12. The purpose of employing the rubber sleeve herein referred to is to prevent noise from metal to metal contact of the shock absorber and the spring. This is in accord with the description of the rubber sleeve as a "silencing sleeve" in plaintiff's sales literature concerning its "Load Leveler."

13. The Patent Office never commented on claims 14 and 15 (claims 2 and 3 of the '938 patent) which were added by the amendment of May 20, 1959, and a notice of allowance was issued within forty-eight hours of the amendment. Patent '938 issued on July 28, 1959.

14. The date of invention with respect to this '938 patent is May 6, 1954, the filing date of Serial No. 427,927 which is the parent application of No. 769,967 on which the '938 patent is based.

15. The combination embraced in claim 2 of the '938 patent consists of the two part shock absorber, the coil spring surrounding the shock absorber, means for supporting the ends of the spring on the shock absorber, and the elongated non-metallic or rubber spacer sleeve. The combination embraced in claim 3 is the same except it omits reference to the means for supporting the spring ends.

The prior art shows numerous examples of combinations of shock absorbers disposed within coil springs and including means for supporting each end of the spring with respect to one of the relatively movable parts of the shock absorber.

16. The patented combination in '938 has as its distinguishing characteristic the elongated non-metallic or rubber spacer sleeve, the primary purpose of which is to prevent noise resulting from metal to metal contact by the spring and shock absorber. It was common knowledge long prior to May 1954, that rubber was useful in preventing noisy metal to metal contacts, and it was also well known prior to May 1954, that rubber sleeves were useful in preventing metal to metal contact between a coil spring

and a relatively movable cylindrical body disposed within the spring.

17. The rubber sleeve as used in the patented combination herein performs in a manner to reduce noise as rubber has been used in the past.

18. Patent '235, herein, entitled "Automatic Auxiliary Support for a Vehicle" refers to the variable rate spring suspension system described therein. Claim 14 thereof is not concerned with an automatic support or a variable rate spring system of any kind. The written description and drawing in the patent relevant to claim 14 reveals a rear suspension of an automobile with the shock absorbers shown therein being disposed within coil springs fixed at each end to one of the relatively movable parts of the associated shock absorber. The drawing also shows the upper end of the shock absorbers mounted closer to the center line of the automobile than the lower ends, to provide a so-called "sea leg" mounting. Such "sea leg" mounting of shock absorbers was used in rear end suspensions of automobiles prior to 1953.

19. The shock absorbers and springs are disposed in "sea leg" fashion by virtue of a bracket to which the upper end of the shock absorber is attached, being mounted inwardly of another bracket to which the lower end of the shock absorber is attached. No reference whatever is made to this relative position of the brackets, nor to the "sea leg" mounting, in the written description appearing in the patent.

20. The relative location of the aforementioned brackets determine whether the shock absorber and spring will be disposed in a "sea leg" position or not and nothing is said about this in the written description. It cannot be determined from the written description whether the "shock absorber and the adjacent coil spring extends angularly between said sprung and unsprung assemblies" as called for by claim 14.

21. Although claim 14 specifies a "rear suspension system for an automotive vehicle", the coil spring and shock absorber unit are also useful on the front end of an automobile in circumstances where the front end is overloaded.

22. The '235 patent in suit was based on application Serial No. 459,441 filed September 30, 1954, by Brooks Walker. All of the twenty-five claims originally filed therein were directed to the automatic variable spring suspension system described therein and none of the claims made any reference whatever to the "sea leg" position of the shock absorbers. The plaintiff's "Load Leveler" unit was marketed in May of 1957 and Walker made very extensive amendments to this application more than a year thereafter on June 17, 1958, but still directed all of his claims to the automotive variable suspension system, none of which made reference to the "sea leg" position of the spring and shock absorber.

23. Walker filed an amendment on May 21, 1959, adding claim 33 (which is now claim 14 of the '235 patent). This was the first occasion on which the applicant Walker made any claim to the "sea leg" position of the shock absorber and coil spring.

24. The description is silent concerning the angularity of the spring and shock absorber being such as to provide a lateral component which will resist lateral sway of the sprung assembly relative to the unsprung assembly, as mentioned in claim 14. Nothing is said regarding what degree of angularity will accomplish this and what will not. The plaintiff's commercial "Load Leveler" was being sold in large quantities more than a year prior to May 21, 1959 when the limitations concerning the angularity of the spring and shock absorber so as to resist lateral sway were first introduced into the claims of the application of the '235 patent. The written description had never included such a statement.

25. A construction in which the combination spring and shock absorber was mounted vertically, instead of in "sea leg" fashion, would not come within the language of claim 14 since the spring and shock absorber would not then extend "angularly between said sprung and un-

sprung assemblies" as called for by the claim. It was known by 1949 that "sea leg" mounting of shock absorbers reduced sway. It has been also known since 1951 that increasing the spring rate of a vehicle (as by adding a helper spring) increases its stability.

26. Defendant's model in suit (Exhibit "D") is representative of the rear suspension system of many automobiles prior to 1953. Defendant's exhibit "A" consists of a shock absorber disposed within a coil spring having each of its ends supported on a relatively movable part of the shock absorber. When a device of this kind is placed in the rear suspension of an automobile in the place where shock absorbers are normally mounted, it results in the structure embraced in claim 14 of the '235 patent.

27. On November 25, 1953 Brooks Walker filed application No. 394,245 entitled "Overload Spring Mounted on Telescoping Type Shock Absorber". The drawing in this application shows a shock absorber disposed within a coil spring attached to either end of the relatively movable parts of the shock absorber which is fitted into the rear suspension system of an automobile in "sea leg" fashion, as described by claim 14 of the '235 patent. This application included no claims describing the "sea leg" position of the shock absorber-coil spring combination, and was abandoned by Walker on December 13, 1957, several months after the plaintiff's "Load Leveler" was publicly sold and used. Walker did not make the claim to the "sea leg" position of the shock absorber-coil spring combination in the '235 application until May 21, 1959, approximately five and a half years after the disclosure of the "sea leg" position of the spring and shock absorber in the application No. 394,245.

28. Fred Knoedler of the Knoedler Manufactures, Inc., of Streator, Illinois, is engaged along with his three sons in the manufacture of farm equipment and has been since 1946. One of the products made by Knoedler is a tractor seat support which includes a hydraulic telescoping shock absorber around which is disposed a coil spring which has each of its ends supported on one of the relatively moving parts of the shock absorber.

29. Early in 1953 Knoedler started work on the device which later evolved as as the "Hydraulic-Shock Booster Spring", Knoedler made up models, applied and tested them on his own cars. These devices consisted of a regular automobile shock absorber with a booster spring disposed about the shock absorber and having the ends of the spring attached to the top and bottom portions respectively of the shock absorber, so that the spring compressed as the shock absorber compressed. Clamps at the top and bottom of the shock absorber held the spring in position.

30. Knoedler applied the devices to a car by installing them at the same place in which the old shock absorbers were installed which resulted in a "sea leg" mounting.

31. The first device made by Knoedler produced a noise due to metal to metal contact between the spring and the shock absorber. Knoedler thereupon used rubber and plastic tubes around the shock absorber to stop the noise by preventing the metal to metal contact. Upon Knoedler becoming satisfied that the device would perform satisfactorily he decided to market it. In August 1953, Knoedler had his office manager begin preparation of sales material. Photographs of the device itself were made both standing alone and also as mounted on the rear of an automobile in the "sea leg" fashion. These photographs were used in the preparation of advertising literature and order guides depicting and describing the device and setting forth its purposes and capabilities. Knoedler's purchase order covering the printing of this literature was dated August 7, 1953.

There was no secrecy concerning Knoedler's development of the hydro shock booster spring and during May 1953 he explained the device to John D. Truedson, one of his salesmen. Knoedler also showed Truedson the hydro shock booster springs which he had on his own automobile and promised to send a set.

to Truedson for use on the latter's car. Truedson received his set by early July 1953 and immediately installed them on his automobile. The devices came to Truedson as a unit, and he installed them where the regular shock absorbers had been which resulted in the devices being disposed in a "sea leg" position.

32. The hydro shock booster spring supplied to Truedson had a plastic sleeve around the body of the shock absorber to prevent metal to metal contact and its resulting noise. These sleeves were on the device at the time Knoedler filed a patent application for his hydro shock booster spring. This patent application No. 377,880 was filed September 1, 1953.

33. The drawings of the Knoedler application show the hydro shock booster spring in detail, including the unit mounted in "sea leg" position on a rear suspension system of an automobile.

This application was abandoned by Knoedler on December 22, 1956 upon failure to pay the final fee in the Patent Office.

34. Robert Knoedler, one of Fred Knoedler's sons, travelled to Fargo, North Dakota in September 1953 and called on an automobile wholesale establishment for the purpose of selling hydro shock booster springs. He left with the Fargo establishment copies of the advertising literature relative to the Knoedler device.

35. Mrs. Jean Munter, who has been employed by Western Auto Parts Company of Fargo, North Dakota, since 1948, as secretary to the president was able to find in the files of her company a copy of the Knoedler literature on the hydro shock booster springs which copy had been received by Western Auto in 1953. Attached to this was a business card of Robert Knoedler. The literature in the file included a notation in Mrs. Munter's own handwriting that hydro shock booster springs had been ordered from the Knoedlers on November 30, 1953.

36. The Knoedlers did not succeed in marketing the hydro shock booster springs because they were unable to purchase shock absorbers needed to manufacture it at a reasonable price.

37. The device manufactured and sold by the defendant which is accused of infringement of the '938 patent and of contributory infringement of the '235 patent comprises a telescopic shock absorber disposed within a coil spring which at each end is supported on one of the relatively moving parts of the shock absorber. It includes a rubber bellows or boot surrounding the piston rod to protect it from flying stones, and also includes, around the central body portion of the shock absorber, a rubber sleeve or bumper which prevents direct contact between the spring and the shock absorber body when passing over rough stretches of road and the like.

38. The defendant first made up units consisting of telescoping shock absorbers combined with coil springs during the spring of 1955. Acting on advice of patent counsel to the effect that this device was not novel and was of an unpatentable nature, containing nothing which was not already a part of the public domain, defendant commenced production and sale of its "Level Ride" device in 1959.

39. The defendant's device included the defendant's standard shock absorber which it had manufactured since about 1954. A coil spring was mounted around such a shock absorber and the resulting device was road tested. The operation of the device, which at first did not include a rubber sleeve, was observed through a cut out portion of the floor of a test car, and it was noted that the spring was wobbling around and striking the body of the shock absorber and the neck of the bellows. To prevent damage to the neck of the bellows, rubber was placed at the point where the spring was striking. The unit gave a satisfactory performance before the rubber was so placed but the noise caused by metal to metal contact was objectionable. The rubber sleeve was installed on the unit to prevent this.

Other units were then tested and the device was placed on sale by the defendant in July or August of 1959.

40. The spring used by the defendant had a rate of about forty pounds per inch. This is the same rate spring as described in the Knoedler literature of 1953 and the same as that used by the plaintiff. The requirement that the helper spring should not boost the rear end of the car to an objectionable height when normally loaded dictates the use of a spring of about this rate. The selection of the spring rate, however, is a matter of designer's skill.

41. Over the years the tendency has been to soften the ride in practically all automobiles from what was formerly a hard ride to what is now referred to by those in the trade as a "baby buggy ride". Therefore, there has been little, if any, need for helper springs. This was particularly true prior to 1957. The "baby buggy ride" reached its peak in about 1957 and has remained there since, and this is reflected by a decrease in the spring rate of automobiles of as much as 20% since 1950. There has been within the last several years an increased need for helper springs due to the increased use of automobiles in towing trailers, boats and the like.

42. The plaintiff has obtained a number of consent judgments against small or moderate sized companies selling helper spring devices alleged to infringe either the '938 or the '235 patent or both. The single instance in which the plaintiff obtained a judgment on the '938 patent after trial was in the case of Monroe v. Champ-Items, Civil Action No. 59 C 255, in the United States District Court for the Eastern District of Missouri. This case was tried before a jury and the plaintiff was awarded one dollar ($1.00).

## CONCLUSIONS OF LAW

### I.

The Court has jurisdiction of the parties and of the subject matter of this action.

### II.

A patent allowed by the Patent Office is presumed to be valid, and the burden of establishing its invalidity rests on the party asserting it. This burden requires clear and satisfactory proof. Title 35 U.S.C.A. § 282; Harman v. Scott, D.C.Ohio 1950, 90 F.Supp. 486, affirmed C.A. 6th, 195 F.2d 916, certiorari denied 343 U.S. 965, 72 S.Ct. 1059, 96 L.Ed. 1362.

### III.

The features on which the patentability of claims 2 and 3 are based are the particulars of the construction of the rubber sleeve and the function which it performs. None of these particulars were disclosed in the application on which the '938 patent herein was based until they appeared in claims added by the amendment of May 20, 1959 which was more than a year after the plaintiff's commercial "Load Leveler", embodying these features, was in public use and on sale in this country. Claims 2 and 3 of '938 patent are invalid. Muncie Gear Works, Inc. et al. v. Outboard Marine & Mfg. Co. et al., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171; Shu-Conditioner v. Bixby Box Toe, 185 F.Supp. 662, D.C.Mass.1960.

### IV.

There is no patentable invention involved in positioning a rubber sleeve around a shock absorber to prevent a surrounding coil spring from making metal to metal contact with such shock absorber. Claims 2 and 3 of patent '938 are invalid because they do not meet the requirements for patentability set forth in 35 U.S.C.A. § 103. Great Atlantic & P. Tea Co. v. Supermarket Equipment Corp. (1950), 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162; Buffalo-Springfield Roller Co. v. Galion Iron Works, 215 F.2d 686, C.A. 6th, 1954.

### V.

The Knoedler device which was invented, known, used and publicized prior to May 6, 1954, the earliest possible date of invention of patent '938, was a full anticipation of patent '938 under 35 U.S.C.A. § 102(a). Claims 2 and 3 of patent '938 are therefore invalid. Brush v. Condit (1889), 132 U.S. 39, 10 S.Ct. 1,

33 L.Ed. 251; Coffin v. Ogden (1873), 18 Wall. 120, 85 U.S. 120, 21 L.Ed. 821; Corona Cord Tire Company v. Dovan Chemical Corp. (1927), 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; De Laski & Thropp, etc. v. Fisk Rubber Co., 1 Cir., 203 F. 986, 992; Twentieth Century Machinery Co. v. Loew Mfg. Co., 243 F. 373, C.C.A. 6th, 1917; National Latex Products Co. v. Sun Rubber Co., C.C.A. 6th (1959), 274 F.2d 224, 233.

### VI.

The '235 patent in suit contains no written description of the invention as required by statute (35 U.S.C.A. § 112) and the sole reference to the "sea leg" position of the shock absorber-coil spring combination and the function it performs was first added by the amendment of May 21, 1959, which was more than a year after plaintiff's commercial device had been publicly used and sold in this country. Muncie Gear Works, Inc. et al. v. Outboard Marine & Mfg. Co. et al., supra; Shu-Conditioner v. Bixby Box Toe, supra.

### VII.

■ There is no invention in placing a prior art combination of spring and shock absorber in a conventional prior art rear end suspension system of an automobile by mounting it on the fittings normally provided for the rear shock absorbers, especially since "sea leg" mounting of shock absorbers to reduce sway was known several years prior to September of 1954. Great Atlantic & P. Tea Co. v. Supermarket Equipment Corp., supra; General Motors Corp. v. Estate Stove Co. (6th, 1953), 203 F.2d 912.

### VIII.

The Knoedler device, which was invented, known, used and publicized prior to September 30, 1954, the earliest possible date of invention of patent '235, is a full anticipation of patent '235 under 35 U.S.C.A. § 102(a). Claim 14 of patent '235 is therefore invalid. Brush v. Condit, supra; Coffin v. Ogden, supra; Corona Cord Tire Co. v. Dovan Chemical

Corp., supra; De Laski & Thropp, etc. v. Fisk Rubber Co., supra; Twentieth Century Machinery Co. v. Loew Mfg. Co., supra; National Latex Products Co. v. Sun Rubber Co., supra.

### IX.

The defendant has met the burden of showing invalidity of the two patents in suit.