**ELECTROL, INC., OF MISSOURI v. MERRELL & CO., Inc., et al.**

No. 8542.

Circuit Court of Appeals, Eighth Circuit.

Feb. 19, 1930.

Clarence B. Des Jardins and Melville Church, both of Washington, D. C., for appellant.

George L. Wilkinson, of Chicago, Ill. (Langdon Moore, of Chicago, Ill., and J. Henry Kinealy, of St. Louis, Mo., on the brief), for appellees.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and DEWEY, District Judge.

874

BOOTH, Circuit Judge.

This is a patent suit in conventional form brought by Electrol, Incorporated of Missouri, against Merrell & Co., Incorporated, defendant, and Williams Oil-O-Matic Heating Corporation, intervener. Infringement is alleged of claims 1 and 5 of patent No. 1,320,936, issued to L. L. Scott for a safety device for combustion systems, November 4, 1919, application filed May 9, 1919; also of claims 1, 2, and 6 of patent No. 1,602,175, issued to L. L. Scott for electrical control system for fuel oil burners, issued October 5, 1926, application filed May 31, 1924. Both of these patents relate to safety control systems for oil-burning apparatus, of the type which includes a fuel pump and an air pump or blower for projecting the mixture of air and fuel into the fire box to be there ignited. Safety devices are necessary, because, if the fuel should not be ignited when the burner motor starts, the continued pumping of fuel into the fire box might flood the furnace, or this fuel might be vaporized and accumulate, and, by being accidentally ignited, cause an explosion. The two Scott patents cover safety devices to guard against such dangers.

Claim 5 of the first patent, which may be

vice responsive to combustion conditions, said devices being included in said circuit and operating under a condition of non-combustion to cooperate and effect the breaking of the circuit to the fuel feed means and thereby cut off the supply of fuel to the combustion chamber."

The elements of the claim are: In a combustion system comprising a combustion chamber, means for feeding fuel thereto and means for igniting said fuel, (1) means including an electrical circuit for operating the fuel feed means; and (2) automatic cut-out mechanism (a) comprising a device adapted to be brought into action when the circuit is closed to the fuel feed means, (b) and a co-operating device responsive to combustion conditions, (c) said devices being included in said circuit, (d) and operating under a condition of non-combustion to co-operate and effect the breaking of the circuit to the fuel feed means and thereby cut off the supply of fuel to the combustion chamber. "(a)" is a slow-acting device; "(b)" is a quick-acting device.

The operation of the device is shown by the accompanying figure (figure 3 of the patent)

Fig. 3

taken as typical, reads as follows: "5. In a combustion system comprising a combustion chamber, means for feeding fuel thereto and means for igniting said fuel, means including an electrical circuit for operating the fuel feed means, and automatic cut-out mechanism comprising a device adapted to be brought into action when the circuit is closed to the fuel feed means and a cooperating de-

and the following statements taken substantially from the specifications:

"When the circuit to the motor is closed at the switch 35, if combustion occurs the expansion of the mercury in the tube 54 acts to depress the diaphragm 56 and raise the outer end of the cut-out lever 58. When the motor circuit is closed the core 70 of the solenoid will be raised and after a certain time

the contact member 72 will engage and slide over and then off of the contact plate 74. During the time the member 72 is in engagement with the contact plate 74 the circuit to the spark plug 7 will be closed. * * * In the upward movement of the post 71 its upper end will not engage the contact 73 on the lever 58 as the latter will have been moved beyond the limit of upward movement of the post 71 by the diaphragm 56. Assuming, however, that combustion did not occur when the system was placed in operation, the diaphragm 56 would not be depressed and the contact member 73 would remain in the lowermost position. As soon, therefore, as the post 71 was raised by the solenoid, its upper end would engage the contact member 73 and thereby place the magnet 68 into the motor circuit. The latch 44 would thereby be withdrawn

of said electrically-operated means, comprising an electric circuit including said electrically-operated means, an electrically-heated thermostatic device which is normally in position to permit the starting of the electrically-operated means, an automatic switch in the electric circuit and which is adapted to co-operate with said electrically-heated thermostatic device either to permit the burner to continue to operate if combustion takes place, or to shut off the burner if there is no combustion, said automatic switch being normally open and operating upon the establishment of combustion to close, whereby upon the failure of combustion, the failure of said switch to close will permit the electrically-heated thermostatic device to render said electrically-operated means inoperative."

The operation is shown by the following figure and the accompanying statement:

by the magnet, allowing the trip lever 43 to fall and break the circuit to the motor."

The foregoing shows the operation of the second form of device under the patent. The first form differs mainly in having a mechanical pressure device in place of the solenoid member. It is to be noted that both forms have a slow-acting device (the solenoid member or the mechanical pressure member) and a quick-acting device responsive to combustion conditions.

The second Scott patent, No. 1,602,175, also includes a safety mechanism for oil burners. Claim 6 is typical. It reads: "6. In an electric control system for oil burners, in combination with electrically-operated means for initiating and maintaining combustion, a safety device for controlling the operation

"When the room temperature falls to the point at which the burner is to be started, the movable arm 33 of the room thermostat engages its fixed contact and, thereupon, a circuit is closed from the transformer secondary 34 through wire 45, room thermostat 33, wire 45, windings 43 of the magnets 10 and 11, bracket 17a, wire 46, plate 47 contacts 37, 36 and 41, thermostatic strip 38, plate 39 and wire 38a to the opposite side of the secondary. Upon the closing of this circuit, the magnets 10 and 11 will be energized, the armature 7 will be attracted and the mercury switch 2 will be tilted to close the motor circuit. The switch 2 will be held closed as long as magnets 10 and 11 are energized, but the circuit just traced will only remain closed for a pre-determined interval after the closing of

the motor circuit. This is due to the fact that the thermostatic strip 38 is a part of it. When the room thermostat closes the circuit just described, it also closes the circuit to the heat coil 42, and that begins to heat up the strip 38. At the end of a certain interval, it will have heated that strip sufficiently to cause contact 41 to move to the right, thus breaking the circuit described. However, when magnets 10 and 11 were energized to attract armature 7, this caused contacts 15 and 16 to engage, thus establishing a circuit from secondary 34 through wire 45, room thermostat 33, wire 45, windings 43, contact plate 17a, contacts 16 and 15, arm 13, plate 14, and wire 48 to the contact 50 of the burner thermostat. Immediately upon the establishment of combustion, the thermostat member 49 moves into engagement with contact 50, so that the circuit is closed between wire 48, contact 50, member 49, and wire 48 to the plate 39 and the opposite side of the transformer secondary 34. If, when the burner motor is started, combustion is established before the heat coil 42 has had time to warp the thermostatic strip 38 and carry contact 41 out of engagement with contact 36, the magnets 10 and 11 will still be maintained energized due to the closing of the circuit through the burner thermostat switch 49. If, however, combustion should not be established, the burner thermostat switch will remain open and the circuit from the winding 43 through that switch will be open. Therefore, when the slow-acting, time device, including the strip 38 finally breaks the circuit between wire 46 and the transformer, the magnets 10 and 11 will be de-energized, and spring 8 will tilt the mercury switch to open the motor circuit."

This mechanism, like those of the first Scott patent, has a slow-acting device and a quick-acting device. The thermostatic strip 38 and its heat coil 42 constitute the slow-acting device, while the combustion switch at 49 constitutes the quick-acting device. The main difference between the two patents is thus described by counsel:

"The invention of his second patent in suit resides in certain improvements upon the safety control of his first patent. Scott perceived that, in the control of his first patent, the operation of the safety switch, to break the motor circuit in case of failure of combustion, depended upon the making or closing of another circuit. He saw that switch points, and contacts, used in connection with such apparatus are likely to become fouled, so that they would not make a good electrical connection, and he realized that, if this hap-

pened, the control circuit would not be closed when it should be, so that the safety switch might not be operated upon the failure of combustion. He, thereupon, devised the system of the second patent in suit, in which the safety control is operated by the opening or breaking of a control circuit, so that there could be no failure because of dirty switch points or contacts. If the points or contacts were fouled, the control circuit would be open and this would cause the safety device to operate. By the invention of his second patent, therefore, he improved upon his first conception and produced a device which was more nearly certain of operation under all conditions which might arise."

### The Prior Art.

The Scott patents were not pioneers in the art of safety devices in combustion systems to stop the flow of fuel in case of cessation of combustion.

Danks, 770,893, as early as 1904 had shown automatic devices for that purpose. These devices, however, were controlled by the steam pressure produced by combustion conditions, instead of directly by the combustion conditions.

Ziegler, 906,357, in 1908, disclosed a safety device for controlling the flow of gas in an instantaneous water heater. Opening the hot water faucet causes the cold water inflow to act on a thermostat, which causes the opening of the main gas burner. The gas will be ignited by the pilot burner supposed to be continuously burning. If, however, the pilot light is out or thereafter goes out, a thermostat switch closes an electric circuit, which energizes an electromagnet. This releases a spring, which in turn closes the valve in the main gas supply pipe, thus shutting off the supply of gas to the main burner.

Carroll, 1,059,977 (1913), has a different form of safety device to accomplish the same purpose as Ziegler.

Schroeder, 1,060,638 (1913), shows still another form of safety device to accomplish the same purpose as Ziegler and Carroll.

Wales, 1,393,654 (1921), is later than the first Scott patent, and is considered only in relation to the second Scott patent. Wales discloses an automatic heating system. It shows a fuel-feeding apparatus driven by an electric motor. The fuel is projected into a combustion chamber. In the motor circuit is a switch controlled by an electromagnet in another circuit, in which is a room thermostat. There is also a thermostat switch acted on by the pilot light. The closing of the secondary circuit closes the motor circuit in a

manner similar to the mechanism in the second Scott patent. If the pilot light is not burning, the room thermostat circuit cannot be closed, and hence the motor circuit cannot be closed so as to start the motor. If the pilot light goes out, the thermostat pilot light switch opens and the room thermostat circuit is broken, which in turn opens the motor circuit switch and the motor stops.

Haas, 1,476,201 (1923), is subsequent to the first Scott patent, and is cited against the second only. It has an electric motor for driving an air blower for projecting fuel and air into the combustion chamber. As in Scott's second patent and Wales, there is a room thermostat low-voltage circuit (control circuit) in which is an electromagnet. The energization of this magnet attracts an armature, which closes the motor circuit. At the same time that the motor is operated, the current of the motor passes through another wire to and through a transformer and back to the other wire of the motor circuit. This sets up a current in the secondary coils of the transformer which operates the spark. Projecting into the burner near the spray nozzle is a thermostat strip. If combustion takes place, the heat will warp the upper end of this strip so that it moves to the left. Co-operating with this thermostat strip is a second thermostat strip fixed at its upper end and positioned near a heating coil, which is connected by wires in parallel to the motor. Current flows through this heating coil whenever the motor circuit is closed. The flow of current through the heating coil heats the thermostat strip, causing its lower end to move to the left. When both thermostats are cold, they are in contact at their two ends nearest each other. If both are heated, they both move to the left, but are still in contact, thus keeping the circuit closed through the magnet which, being energized, keeps the motor circuit closed. But if combustion does not take place, or, having taken place, ceases, the combustion thermostat will remain cold, and its end will not warp to the left, but the end of the other thermostat, being heated, will warp out of contact, thus breaking the circuit through the magnet, which, being de-energized, lets its armature drop, thus breaking the motor circuit. The action of the whole mechanism is similar to the action of the mechanism in the Scott second patent. However, the Haas device is imperfect in this, that, after the motor has stopped, the thermostat near the heating coil will on cooling again return into contact with the combustion thermostat. This will again close the control circuit, energize the magnet, and close the motor circuit; when the same cycle of movements will again follow. The record does not disclose the period of time occupied by this cycle or by the different phases thereof.

The prior disclosure of the patent to Sherman and Sheppard, 1,523,564 (January 20, 1925), application filed July 8, 1918, and the prior uses made by those men of their invention, are strongly relied upon by defendant, and as strongly contested by plaintiff. The disclosure of the Sherman and Sheppard patent may be used so far as such disclosure was made prior to May 9, 1919, the date of filing the application in the Scott first patent. The Sherman and Sheppard patent itself cannot be used to support the defense of prior patenting or prior publication, but the disclosure made in the original application or in amendments thereto made prior to May 9, 1919, is available as defensive matter. Milburn Co. v. Davis, etc., Co., 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651. From such disclosure it is apparent that the mechanism of the Sherman and Sheppard application comprised a slow-acting device as in the first Scott patent, and that, when combustion failed to start, or having started, was interrupted, the two devices co-operated to break the motor circuit by means of an electrically controlled latch release, also as in the first Scott patent. Details of construction naturally were different.

Sharp challenge is made by plaintiff as to the position claimed by defendant for the quick-acting thermostatic device in the mechanism of the Sherman and Sheppard disclosure. Plaintiff claims that the position was such that the heat of combustion had very slow effect upon the device. We have examined with care the file wrapper and the other evidence bearing on the matter, and are clearly of the opinion that the disclosure prior to May 9, 1919, showed that the quick-acting thermostatic device was located in close proximity to the fire box and was controlled by the temperature thereof. The evidence—documentary, oral, and physical—also shows, and it is conclusive in our opinion, that operative installations following the teachings of the Sherman and Sheppard application were made prior to May 9, 1919, the date of the application of the Scott patent 1,320,936; and no attempt has been made to carry the alleged Scott invention back prior to the date of the application of the patent.

It is to be noted that the Sherman and Sheppard application was not mentioned by the Patent Examiner in connection with the

examination of the application for the first Scott patent.

■ We have given consideration also to the contention of plaintiff that the Sherman and Sheppard installations were mere abandoned experiments, but the evidence convinces that the contention cannot be sustained. The installations were in successful operation for several years. Where a device has been brought to the stage of successful operation, it cannot be considered an abandoned experiment simply because its operation is not continued indefinitely. Hopkins on Patents, § 78; Brush v. Condit, 132 U. S. 39, 48, 10 S. Ct. 1, 33 L. Ed. 251; Bromley, etc., Co. v. Stewart (C. C.) 51 F. 912, 915.

The Williams first prior use device was substantially the same as the first form of defendant's accused devices. It concededly was put into practical use prior to the second Scott patent 1,602,175. A discussion of this prior use device will be had later in taking up the several accused devices of defendant.

The Williams second prior use was also devised and put into operation prior to the second Scott patent, but was never put to commercial use. In some respects it was similar to the mechanism of both of the Scott patents. It had a slow-acting device and a quick-acting device; the latter acted upon by combustion conditions. As in the mechanisms of the two Scott patents, if combustion did not start the slow-acting device would after a predetermined time cause a break in the motor circuit. If combustion started and afterward ceased, the quick-acting device would cause a break in the motor circuit. But in the second Williams prior use the breaking of the motor circuit was caused by the making of a circuit, as in the first Scott patent, not by the breaking of a circuit, as in the second Scott patent.

■ In view of this state of the prior art, and in view of the fact that several of the prior art patents now produced were not cited against the Scott patents in the Patent Office, our conclusion is that the two Scott patents can be held valid only by confining them quite closely to the specific forms described in their respective specifications and drawings. Thus construed as narrow patents, they can be given only a correspondingly narrow range of equivalents. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 415, 28 S. Ct. 748, 52 L. Ed. 1122; Adams Elec. Ry. Co. v. Lindell Ry. Co., 77 F. 432 (C. C. A. 8); National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 106 F. 693 (C. C. A. 8);

Mallon v. William C. Gregg & Co., 137 F. 68, 78 (C. C. A. 8); Anakin Lock Works v. Dillon Lock Works, 292 F. 45 (C. C. A. 8); Knick v. Bowes "Seal Fast" Corp., 25 F. (2d) 442, 446 (C. C. A. 8); R. H. Buhrke Co. v. Brauer Bros. Mfg. Co., 33 F. (2d) 838, 839 (C. C. A. 8).

In the Adams Elec. Railway Co. Case, supra, this court said (page 440 of 77 F.): "One who invents and secures a patent for a machine or combination which first performs a useful function is protected thereby against all machines and combinations which perform the same function by equivalent mechanical devices; but one who merely makes and secures a patent for a slight improvement on a device or combination, which performs the same function before as after the improvement, is protected against those only who use the very improvement that he describes and claims, or mere colorable evasions of it. 'If one inventor precedes all the rest, and strikes out something which includes and underlies all that they produce, he acquires a monopoly, and subjects them to tribute. But if the advance towards the thing desired is gradual, and proceeds step by step, so that no one can claim the complete whole, then each is entitled only to the specific form of device which he produces, and every other inventor is entitled to his own specific form, so long as it differs from those of his competitors, and does not include theirs.' Railway Co. v. Sayles, 97 U. S. 554, 556 [24 L. Ed. 1053]."

In the National Hollow Brake Beam Co. Case, supra, this court said (page 712 of 106 F.): "Where the advance towards the desideratum is gradual, and several inventors form different combinations which accomplish the desired result with varying degrees of operative success, each is entitled to his own combination so long as it differs from those of his competitors and does not include theirs."

In the Anakin Lock Works Case, supra, this court said (page 47 of 292 F.): "In case of a pioneer patent the claims are to be given a broad and liberal construction (Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053); while in case of a patent involving mere improvements, in view of the prior art, the claims are to be narrowly construed and limited to the particular mechanism described, and any device which accomplishes the same result by means of different mechanism is not an infringement."

In the R. H. Buhrke Co. Case, supra, this court quoted with approval the following from Mallon v. William C. Gregg & Co., 137

F. 68 (C. C. A. 8): "The case is one in which the art was not developed in a single leap by one great genius, but in which many men have contributed both the genius of inventors and the skill of mechanics to its progress, and the advance in it has been gradually made, step by step. It falls within the rule that where the advance towards the desideratum is gradual, and several inventors form different combinations and make different improvements which materially aid to accomplish desired results, each is entitled to his own combination or improvement, so long as it differs from those of his competitors and does not include theirs."

### Infringement.

It is claimed that three of defendant's devices infringe the first Scott patent. Form 1 of defendant's accused devices is known as the Williams control. The following statement in connection with the accompanying figure will explain its operation:

"In this wiring diagram, the relay switch and safety switch members are shown midway of the usual positions. When the burner is not operating, the armature lever 11 is in the 'off' position, at the right of the diagram, in engagement with the electromagnet 13, the contacts 5 and 6 are separated and the contacts 15 and 14 are in engagement with each other. Similarly, the safety switch contacts 24 and 23 are normally closed. * * *

"Assuming that the room temperature drops to the prescribed limit, member 9 of the room thermostat causes the contacts 17 and 16 to engage each other and the following circuit is established, energizing the electromagnet 18; from the secondary winding of the transformer 10, through wire 19 and the circuit closer on the end of the armature lever 11, through contacts 15 and 14, wire 20, the winding of the electromagnet 18, wire 21, contacts 16 and 17, thermostat member 9, wire 22, through the safety switch and

880

contacts 23 and 24 and wires 25 and 26 to the opposite side of the transformer secondary. This energizes the electromagnet 18 and the armature lever is drawn to the left, to the 'on' position, causing the contacts 5 and 6 to engage, the contacts 15 and 14 to be separated, and the contacts 27 and 28 to engage. This closes a circuit, as follows, through the electric motor 1 to operate the burner: From the main wire 2 through wire 4, contacts 5 and 6, wire 7, motor 1, and wire 8 to the other main line wire 3. The electric motor 1 and, therefore, the oil burner is set in operation, and continues to operate provided the fuel ignites and combustion occurs in the combustion chamber. * * *

"The operation of the safety mechanism is as follows. Upon the closing of the main motor circuit, due to the movement of the armature lever 11 to the 'on' position, the following safety circuit is established including the stack control contacts 32, 33, and heating coil 34 of the safety switch: From the secondary of the transformer 10, through wire 19, contacts 27 and 28, wire 30, wire 39, stack control contacts 33 and 32, wire 37, heating coil 34, wire 36 and wire 26 to the opposite side of the transformer secondary. Since, at the instant of the closing of the main motor circuit, combustion does not exist in the combustion chamber, the stack control contacts 32 and 33 are closed and the foregoing circuit is established, which causes the heating coil 34 to begin to heat up. If the fuel projected into the combustion chamber by the operation of the burner motor is ignited, and combustion takes place within a few seconds, the stack control contacts 32 and 33 are separated, thus breaking this safety circuit and interrupting the heating effect of the coil 34. However, if, for any reason, the fuel projected into the combustion chamber should not be ignited, so that the combustion does not occur in the combustion chamber, the contacts 32 and 33 remain closed and the coil 34 continues to heat up with the result that, at the end of a predetermined interval, it has heated the bi-metallic strip 35 sufficiently to warp the latter into contact with the member 40 of the safety switch and to throw the safety switch from its normal closed position to a position in which the contacts 24 and 23 are separated and the contacts 24 and 41 are in engagement. The interval of time needed for the coil 34 to heat up to the point of operating the safety switch is considerably greater than the interval needed for the stack control contacts 32 and 33 to separate after the initiation of combustion in the combustion chamber. Upon the opening of the safety switch, and the separation of the contacts 23 and 24 and the engagement of the contacts 24 and 41, the following circuit is established, which shuts off the burner motor: From the secondary of the transformer 10, through the wire 19, the circuit closer on the end of the armature lever 11, contacts 27 and 28, wire 30, wire 39, wire 38, the winding of the electromagnet 13, wire 31, wire 42, contacts 41 and 24, the safety switch, and wires 25 and 26 to the opposite side of the transformer secondary. This energizes the electromagnet 13 and draws the armature lever 11 to the 'off' position, separating the contacts 5 and 6 and breaking the main motor circuit."

It is true that this first form of mechanism of defendant has two switches, one slow-acting and one quick-acting, and that plaintiff's patent discloses two switches acting in like manner. But the dissimilarities between the two devices are striking. In defendant's mechanism, the slow-acting device (the thermostatic bar 35 and the switch moved thereby) is not operatively connected with the fuel feed means. In defendant's mechanism, the quick-acting combustion switch is in a control circuit which directly controls a second control circuit, which latter, when closed, energizes the "off" magnet 13 to break the fuel motor circuit. In defendant's mechanism there is no equivalent of the switch of plaintiff which has the movable contact points 71 and 73 and accompanying parts, whereby each contact point is moved relative to the other, and whereby one contact point is moved by a slow-acting device for a predetermined time and the other contact point is moved by a quick-acting device responsive to combustion conditions. The slow-acting device in plaintiff's patent acts continuously while combustion is going on; in defendant's mechanism, the slow-acting device ceases to operate if combustion is begun and maintained.

This first form of mechanism is not claimed to infringe the second Scott patent.

The second accused form of defendant, known as Federal control, has two high-voltage circuits, each of which includes the motor. Its operation will be understood from

the following statement and the accompanying figure:

circuit. As said before, this first or initial fuel motor circuit includes the heat coil 14

"The initial fuel motor circuit of this system has a switch 34 including a mercury tube carried by a bracket 33, which bracket also carries a weight 36 arranged to move the switch into open position unless it is held in closed position by the ratchet wheel 32 carried at the upper end of a shaft 32a, which is normally kept from rotating by being soldered in a post 32b. If the solder is heated long enough by the electric heating coil 14, which is in the first or initial fuel motor circuit the solder will become soft enough to allow the shaft 32a and the ratchet wheel 32 to rotate and thereby allow the weight 36 to move the switch into open position. There is also in the running fuel motor circuit a safety switch 31 responsive to combustion and which is normally in open position, but in the presence of combustion moves to closed position to complete a circuit therethrough.

"In defendant's second form when there is a call for heat the room thermostat closes, thereby closing the first or initial fuel motor

of the switch 34 and if this circuit is maintained for a minute and one-half or two minutes through the heat coil the solder in the post 32b will be melted and thereby allow the weight 36 to move the switch 34 to open the motor circuit and stop the burner.

"However, if combustion occurs the second or running fuel motor circuit will be closed through the safety switch 31. This circuit shunts the current around the heat coil. While the circuit through the heat coil 14 is not thus mechanically opened it is operatively opened since electricity will follow the line of least resistance and this form of control is designed so that when the running fuel motor circuit is closed through the safety switch 31 no appreciable amount of current will pass through the initial fuel circuit and the heat coil 14."

Here also there are a slow-acting safety device and a quick-acting combustion switch as in plaintiff's patent 1,320,936, but the differences between the two mechanisms are

material and far-reaching. In defendant's mechanism—

"1. There is no magnet which when energized breaks a sole circuit to the fuel motor.

"2. There is no control circuit for energizing a magnet to break a sole circuit to the fuel motor.

"3. There is no switch operating to keep open a control circuit distinct from the motor circuit when there is combustion and to close said second circuit and thereby open the motor circuit when there is no combustion.

"4. There is no device or switch having two contact points each movable relative to the other; one of the points being moved by a slow-acting device actuated when the fuel motor is placed in operation, and the other being moved by a device actuated by and directly responsive to combustion conditions."

The action of the two mechanisms is different. In defendant's mechanism, under no condition is there a movement or an actuation of the slow-acting switch 34 until the first or initial motor circuit has been closed for a predetermined time. Further, there is no coaction between the slow-acting device and the quick-acting device. In case of ignition failure, the slow-acting device acts and the quick-acting device remains quiescent. In case of combustion failure, the slow-acting device having been previously put out of the fuel motor circuit, the quick-acting device acts to open its own motor circuit, and this in turn renews the operation of the slow-acting device, which shortly opens its motor circuit, and the motor stops.

There are also a number of differences between defendant's second form and the mechanism disclosed by the Scott second patent, 1,602,175, although in both the safety control functions on the breaking rather than the making of a circuit. There are in defendant's mechanism no co-operating devices in different control circuits. There are no control circuits in defendant's second form mechanism; but there are two high-voltage motor circuits. There is no magnet in a control circuit which when energized closes the motor circuit.

The third accused form of defendant is known as the Honeywell control, and its operation is shown by the following statement and accompanying figure:

HONEYWELL NO 3-B WIRING DIAGRAM.

This system has a slow-acting device, consisting of a small electric motor, two arms attached to the shaft of the motor, each arm carrying three contact points; also two sets of concentric contact rings operated on separately by said arms and their attached contact points; also three isolated contact points operated on by said arms and their contacts; and a transformer. It also has a quick-acting device, consisting of a mercury tube, which is subject to combustion conditions, and which is normally open. There are two separate main line motor circuits which operate the fuel motor and the heating system. One is called the initial or starting fuel motor circuit, the other the running fuel motor circuit.

When heat is required, the small electric motor in the slow-acting device starts operating, due to electrical circuits being made by the co-ordination of the aforesaid arms and their contact points, the concentric rings, the isolated contact points, the transformer, and an ordinary room thermostat. This operation of the small electric motor causes one of the arms on its shaft to close the initial or starting fuel motor circuit, and the fuel motor starts. The small motor continues to function, due to different electrical circuits being set up in the slow-acting device. After a predetermined period, the small electric motor breaks the initial or starting fuel motor circuit. If in the meantime combustion has taken place, the quick-acting mercury tube will have functioned to a closed position. This mercury tube is in the running fuel motor circuit. As soon as the small electric motor has broken the initial or starting fuel motor circuit, it has brought its arms, contact points, and concentric rings into position to form the running fuel motor circuit. As mentioned, if combustion has taken place, the mercury tube switch has closed and thus the running fuel motor circuit is complete and the fuel motor continues to operate. At this point the small electric motor ceases to operate, due to a break in one of its control circuits. If thereafter combustion should cease, the mercury tube switch would open, and thereby break the running fuel motor circuit. This would cause the fuel motor to stop.

Working simultaneously with the quick-acting mercury tube switch is also a smaller mercury tube switch. This small mercury switch is in one of the control circuits operating the small electric motor, and is thus in the slow-acting device. This small mercury switch is normally closed. At the same time that the large quick-acting device mercury switch closes, this small mercury switch opens and prevents the small electric motor from further operating through the control circuit in which the small mercury tube is placed. Also if, after combustion has started, it then ceases, and the quick-acting large mercury switch has functioned to open the running fuel motor circuit, this small mercury switch acts, and either alone or in conjunction with a manually operated switch, operates to bring the entire mechanism to its starting position.

If upon the making or during the continuance of the initial or starting fuel motor circuit, combustion does not take place, the slow-acting device will cause the fuel motor to cease running. At the end of the predetermined period of the initial or starting fuel motor circuit, the small electric motor breaks the initial or starting fuel motor circuit, and brings the arms, contact points, and concentric rings into position to form the running fuel motor circuit; however, as combustion has not taken place, the large mercury tube switch is open and the running fuel motor circuit is not set up—all of which causes the fuel motor to stop. Also the small mercury tube has remained quiescent in its normally closed position. In conjunction with the manually operated switch it will function to bring the entire mechanism to its starting position.

Here also defendant's mechanism includes a slow-acting device, and a quick-acting device responsive to combustion conditions, as in plaintiff's patent 1,320,936; but again the differences are material: (1) There is no electromagnet, which when energized breaks a sole circuit to the fuel motor. (2) There is no switch having two contacts each movable relative to the other and co-operating to keep open during combustion and closed when there is no combustion. (3) There is no switch having two movable contacts, one of which contacts is moved by a slow-acting device and the other of which contacts is moved by a fast-acting combustion device. (4) There is no slow-acting device actuated at all times when the fuel motor is in operation.

There are also numerous differences between defendant's third form and the mechanism disclosed by the Scott second patent, 1,602,175, although in both the safety control functions on the breaking rather than the making of a circuit. In defendant's third form there is no electrically operated switch controlled by electromagnets which operates to keep closed a sole circuit to the fuel motor. There is in defendant's third form no slow-acting device thermostatically operated.

▮ In view of the prior art heretofore pointed out, the narrow construction which

must be given to the two Scott patents, the correspondingly narrow range of equivalents to be accorded to them, and the material differences existing between the devices disclosed by those patents and the accused devices of defendant, we are led to the conclusion that no one of the accused devices of defendant infringes claims 1 or 5 of the Scott patent 1,320,936, or claims 1, 2, or 6 of the Scott patent 1,602,175.

The decree dismissing the bill was right, and it is affirmed.